## SCHULTE v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. January 23, 1926.)

No. 4579.

1. **Criminal law** ⟨⟩394—**Intoxicating liquors** ⟨⟩249—**Search without warrant of premises and garage, on detecting odor of mash, held reasonable, and evidence procured admissible (National Prohibition Act [Comp. St. Ann. Supp. 1923, § 10138¼ et seq.]).**

Where officers detected odor of mash before entering defendant's premises and on entering found pool of mash in yard and were told by defendant that he was making whisky, and were led into garage building, where still was located, *held* search and seizure was reasonable and evidence procured admissible, in prosecution for violating National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.).

2. **Criminal law** ⟨⟩1091(7)—**Bill of exception, complaining that jurors who heard testimony of officers on hearing preceding trial were permitted to serve, held insufficient.**

Bill of exceptions, complaining that jurors who heard testimony of officers on hearing preceding trial, on question whether officers would be permitted to testify, were allowed to serve, *held* insufficient for failure to show that jurors in fact heard the testimony.

Foster, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of Louisiana; Charles R. Beattie, Judge.

Fred Schulte was convicted of manufacturing liquor and possessing apparatus designed therefor, in violation of the National

Prohibition Act, and he brings error. Affirmed.

Walter W. Wright, of New Orleans, La., for plaintiff in error.

Wayne G. Borah, U. S. Atty., and Arthur A. de la Houssaye, Asst. U. S. Atty., both of New Orleans, La.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

BRYAN, Circuit Judge. Fred Schulte was convicted of manufacturing liquor and having in his possession apparatus designed for the manufacture thereof, in violation of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.).

He assigns as error the court's refusal to suppress the testimony of two prohibition officers, who went upon his premises without a search warrant and there found where he had been operating a still and manufacturing whisky in one end of a small building, the other end of which was cut off by a partition and used as a garage. This building was separate and apart from defendant's dwelling house. The officers testified that they detected the odor of mash before they entered defendant's premises; that they then went into his back yard, where he was, and where they found a pool of mash; that one of them asked defendant what he was doing there, and he replied that he "was making whisky," and voluntarily took them into the building where the still was. No search of defendant's dwelling house was made or even attempted.

[1] Under these circumstances, proof of the search and seizure was admissible, even though the doubtful concession be made that the officers were trespassers. Hester v. United States, 44 S. Ct. 445, 265 U. S. 57, 68 L. Ed. 898. Defendant relies on Agnello v. United States, 46 S. Ct. 4, 70 L. Ed. 1. In that case it was held that the search of Agnello's premises without a search warrant was unlawful. But the officers invaded Agnello's dwelling house without a search warrant and without themselves having witnessed a violation of the law. However, the right of the officers to enter without a search warrant the home of Alba, one of the defendants in the cited case, and to seize cocaine the illegal sale of which they saw take place while they were looking through a window of Alba's house, was upheld, the court saying: "Such searches and seizures naturally and usually appertain to and attend such arrests." If Alba's home could be entered without a search warrant

and cocaine there found be used as evidence, it must necessarily follow that defendant's garage could be entered without a search warrant by the officers who caught him violating the prohibition law.

[2] There is an assignment of error which complains that jurors who heard the testimony of the officers upon a hearing preceding the trial, upon the question whether the officers would be permitted to testify, were allowed to serve on the jury. But this assignment must fall for lack of support in the bill of exceptions, because it is not shown thereby that the jurors heard that testimony. Besides defendant admitted his guilt on the preliminary hearing. His only hope of acquittal was that the search would be held illegal.

The judgment is affirmed.

FOSTER, Circuit Judge (dissenting). As the majority opinion omits mention of certain undisputed facts which I consider important in deciding the issues presented, at the risk of repetition, it is necessary to state those I deem material.

The officers did not have a search warrant. Matthews, who was evidently in charge, testified, referring to himself and his two associates, that they had received information that a still was located on Schulte's premises; that they went there, and, as they approached, they detected an odor of mash; that they went into the yard and called; that Schulte came from what seemed to be the kitchen; that he (Matthews) met him; that he did not tell him he was a prohibition agent, but told him he wanted to inquire about some of his neighbors; that he then preceded Schulte and pointed out some buildings to him, and asked him who lived there; that he then looked down and saw mash running from the building he called the garage, and questioned Schulte about it.

It was after this that Schulte admitted his guilt and showed them his still, which was not then in operation. The shed or outhouse or garage, whichever it may be termed, and in which the still and mash were discovered, was only a few feet from the main building, eight or ten at the most. The defendant testified that the building was used, not only as a garage, but also as a summer kitchen and a washhouse, but that is immaterial. It may be also inferred that the premises were inclosed by a fence, but that too is immaterial.

It must be borne in mind that we are not dealing here with a case where a garage or other outhouse adjacent to a residence has been entered under authority of a search warrant. The officers did not have a warrant. Nor is it a case where a building entirely disassociated with any habitation is discovered and searched. The building searched was close to Schulte's dwelling and within the yard. And it is not a case involving a search as incidental to a lawful arrest, as is erroneously assumed by the majority opinion. The officers obtained admission to Schulte's premises by subterfuge and stealth. The sole fact that the officers smelled mash while outside of Schulte's premises was not evidence that a crime was being committed, although it has been held in some cases to be sufficient to show probable cause for the issuance of a search warrant. Circumstantial evidence must exclude every other reasonable hypothesis to establish guilt. He might have had the mash for a legitimate purpose. The still was not in operation, so the officers never did see the commission of the crime of manufacturing intoxicating liquor for which Schulte was convicted, and, but for the admissions of Schulte, obtained as a result of the prohibition officers entering his house in force, with the implied coercion of that act, there could have been no conviction. In other words, the officers did not catch him violating the prohibition law until after they had unlawfully entered his premises. This court has heretofore drawn the law distinctly in such cases. Pressley v. U. S. (C. C. A.) 289 F. 477; Giusti v. U. S. (C. C. A.) 4 F. (2d) 703.

The search cannot be justified on the ground that the still and mash were contraband. The provisions of the Volstead Act and the hysteria attendant upon its enforcement have heretofore created some confusion on this score, but the recent case of Agnello v. U. S., 46 S. Ct. 4, 70 L. Ed. 1 (decided October 12, 1925), has clarified this situation. In that case the property seized was contraband, and there was ample evidence to show probable cause of Agnello's guilt; yet the Supreme Court held the search of his dwelling without a warrant to be illegal and the evidence thus obtained inadmissible.

The clear-cut issue presented is whether any of Schulte's rights, protected by the Fourth and Fifth Amendments of the Constitution of the United States, have been violated by federal officers. It may be well to quote from the amendments:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Fourth Amendment.

No person "shall be compelled in any

criminal case to be a witness against himself. " " " " Fifth Amendment.

On this point the majority opinion seems to proceed on the theory that the Fourth Amendment applies to a dwelling house only, and, because Schulte's dwelling house was not entered, his rights under the Constitution were not invaded, even though it be conceded the officers were trespassers. Hester v. U. S., 44 S. Ct. 445, 265 U. S. 57, 68 L. Ed. 898, is relied on as authority for this conclusion. That case is not in point, as the facts differ materially from those of the case at bar, and the narrow construction of the amendments is not supported by the decision.

In the Hester Case the material facts were these: The revenue officers, in consequence of information, went towards the house of Hester's father, where Hester lived, and concealed themselves some 50 to 100 yards away. One Henderson drove near the house and they saw Hester come out and hand him a quart bottle. An alarm was given. Hester went to another car standing near, took a gallon jug from it and he and Henderson ran. One of the officers fired a pistol. Hester dropped his jug. It broke but kept a part of its contents. The jug and bottle both contained moonshine whisky. The other officer entered the house, but, being told that there was no whisky there, did not attempt to search it, and left. Subsequently a bottle was found on the outside. It had been broken but also contained whisky. There was nothing to show that the place where the officers concealed themselves was part of the premises, and the place where the chase and arrest took place, though it might have been on the premises, was a road open to the public.

So far the arrest and seizure was justified under the extreme doctrine subsequently announced in the case of Carroll v. U. S., 45 S. Ct. 280, 267 U. S. 132, 69 L. Ed. 543, 39 A. L. R. 790. In concluding the opinion, the court said this:

"The only shadow of a ground for bringing up the case is drawn from the hypothesis that the examination of the vessels took place upon Hester's father's land. As to that, it is enough to say that, apart from the justification, the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 Bl. Comm. 223, 225, 226."

The above reference to the "open fields" is more euphemious than accurate, and not at all necessary to the decision rendered, but at that it is a far cry from the "open fields" to a shed within leaping distance of a man's bedroom.

If Blackstone is authority for the statement that the Fourth Amendment does not extend to the open fields, the pages cited above are also authority for the doctrine that it does extend to everything within the curtilage which includes the yard and garden and any barn, stable, or warehouse therein as well, as the dwelling itself, whether the premises are inclosed by a fence or not. See Bouvier's Law Dictionary; Black's Law Dictionary; Standard Dictionary—verbo, "Curtilage." In fact, in the case of Cook v. State, 3 So. 849, 83 Ala. 62, 3 Am. St. Rep. 688, it was held to be a question for the jury to say whether a barn situated outside of the inclosure surrounding the dwelling, and 75 yards from the front yard, was within the curtilage.

The courts have uniformly held these amendments are to be construed together in determining the rights of the people under them. The Fourth Amendment makes no distinction as between dwellings and other houses, and it would seem that the most narrow construction would protect a person against an unreasonable search of any of his houses, whether outhouse, store, or residence, if evidence against him was thereby obtained, but beyond that the Supreme Court has given them the broadest possible interpretation.

In the leading case of Boyd v. U. S., 6 S. Ct. 524, 116 U. S. 616, 29 L. Ed. 746, in which the court was considering statutes intended to authorize the forced production of books and papers to be used as evidence in suits brought by the United States for forfeiture under the customs laws, instead of confining the opinion to the narrow limits of the case, the court, through Mr. Justice Bradley, took occasion to review extensively the history and developments of the common law from which the amendments are drawn, and treated the subject in the broadest possible way, pointing out the exceptions to the general rule such as the seizure of stolen goods or search conducted as incidental to an arrest and otherwise. The opinion quotes largely from Lord Campden's discussion of the subject in the case of Entick v. Carrington, 19 Howell's State Trials, 1029, and approves the rule enunciated by him. Referring to the statute under consideration, the court said:

"It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed."

Undoubtedly, the Boyd Case is the leading authority in the interpretation of the Fourth and Fifth Amendments. It has been referred to as authority in nearly every case considered by the Supreme Court since then. In the case of Interstate Commerce Commission v. Brimson, 14 S. Ct. 1134, 154 U. S. at page 479 (38 L. Ed. 1047), the court said:

"We said in Boyd v. United States, 6 S. Ct. 524, 116 U. S. 616, 630 [29 L. Ed. 746] —and it cannot be too often repeated—that the principles that embody the essence of constitutional liberty and security forbid all invasions on the part of the government and its employés of the sanctity of a man's home, and the privacies of his life."

The eminent authority, Cooley, in discussing the same subject, likewise reviews the common law authorities, and says:

"The maxim that 'every man's house is his castle' is made a part of our constitutional law in the clause prohibiting unreasonable searches and seizures.  *  *  *

And again, after noting the cases in which search may be made without a warrant:

"The law favors the complete and undisturbed dominion of every man in his own premises, and protects him in it with such jealousy that he may defend his possessions against intruders in person, or by his servants or guests, even to the extent of taking the life of the intruder, if that seem essential to the defence." Cooley's Cont. Lim. pp. 299, 308.

Could there be any doubt that the words of the Fourth Amendment, "houses, papers and effects," are symbols of the broader and deeper meaning of the amendments? Could any one say that "houses" is not synonymous with and equivalent to "homes"? A man's home is not merely the house in which he dwells or the rooms in which he sleeps and takes his meals. It includes the entire premises in which he lives.

It is useless to cite cases that are merely analogous, although the protection of the Fourth Amendment has been extended to corporations, which, of course, have no dwelling, to office buildings, to lodgerooms, and other premises and to letters in the mail. The subject is discussed, and many pertinent decisions reviewed in the well-considered and logical opinion of Judge Peck in U. S. v. Slusser (D. C.) 270 F. 818, in which he held that a garage on the premises of defendant could not be searched without a warrant and that a confession secured after the unlawful entry was inadmissible in evidence, a case very similar in its facts to the one at bar.

To my mind the conclusion is irresistible that the Fourth Amendment affords protection to a person against an unreasonable search of any building on his premises and within his curtilage as well as the building in which he actually dwells. His right of privacy is as much invaded by an unlawful entry of his barn or garage as of his dwelling. In this case a warrant might perhaps have been secured, on the evidence that the odor of mash had been detected, or on the affidavit of the informer who first told the prohibition officers that a still was on the premises, but in that event the question of probable cause would have been decided by the commissioner issuing the warrant and not by the prohibition officers taking the law into their own hands. In the Agnello case, supra, the court said:

"The protection of the Fourth Amendment extends to all equally—to those justly suspected or accused, as well as to the innocent. The search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws. Congress has never passed an act purporting to authorize the search of a house without a warrant. On the other hand, special limitations have been set about the obtaining of search warrants for that purpose."

In the Carroll Case, supra, Justice McReynolds, dissenting it is true, gave voice to these pertinent remarks:

"The damnable character of the 'bootlegger's' business should not close our eyes to the mischief which will surely follow any attempt to destroy it by unwarranted methods. 'To press forward to a great principle by breaking through every other great principle that stands in the way of its establishment; *  *  * in short, to procure an eminent good by means that are unlawful, is as little consonant to private morality as to public justice.' "

For the reasons above given, I respectfully dissent.