**Clyde Albert WALKER, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 15433.**

United States Court of Appeals
Fifth Circuit.

Aug. 26, 1955.

Rehearing Denied Oct. 3, 1955.

**448**

R. Clifford Fulford, Birmingham, Ala., for appellant.

Frank M. Johnson, Jr., U. S. Atty., Fred S. Weaver, Asst. U. S. Atty., Birmingham, Ala., for appellee.

Before RIVES and CAMERON, Circuit Judges, and DAWKINS, District Judge.

CAMERON, Circuit Judge.

Upon evidence obtained by federal and state agents acting without a search warrant, the appellant, Clyde Walker, was indicted and convicted of illegal distillation and possession of untaxed whiskey. From this conviction, Walker appeals on the ground that the District Court erred in overruling his motion to suppress and his objections to admitting evidence so obtained. This appeal presents the question whether Walker's barn is afforded the protection of the Fourth Amendment to the Constitution and whether this protection is destroyed under the claim of the officers that they had probable cause for making the search without a warrant.

An agent for the Internal Revenue Bureau was informed at his office in Birmingham that, "there might be something on the Clyde Walker place". This information was from an anonymous source and the agent could not recall when it came or whether it was in the form of a letter or a telephone call. Due to the vague and suspicious nature of the message and the large number of unreliable anonymous messages received by him, the agent doubted its credibility and so testified. Sometime after receipt of the message, however, the agent went, in company with one other federal agent and three state and local officers, to appellant's farm to "look around".

Walker's house, barn and other outhouses lay approximately one mile from the public road and access to them and to his farm could be had only by a private road. While on the private road about one-fourth mile from the Walker house, two of the local officers left the automobile with instructions to circle the farm through the woods and look for possible distilling activities. The other officers drove on to the house. Appellant's barn was seventy to eighty yards from his house, separated therefrom by his private driveway, and was surrounded by a fence with a gap allowing entrance into the barnyard from the private driveway in front of the house.

Upon arriving at the circular driveway in front of appellant's house, the federal agent and one local officer entered the barnyard through the gap which was open at that time. They had seen appellant working on his tractor at the rear of the house and some distance away from the house and the barn. Appellant waved to them and said, "Hi". As the officers approached to within about thirty feet of the barn, they noticed a black garden hose running from the barn, became aware of the odor of cooking mash, and heard a metallic thump and the sound of running footsteps inside the barn. On such perception, the officers entered the barn where they found a still in operation, complete except for the capper which had been knocked off, several barrels of mash,

twelve gallons of whiskey and a man named Johney Nunnally whom they arrested. The officers could not see inside the barn until they had opened the door and had entered that portion of the barn in which the distilling equipment was found. At the completion of the search, appellant was arrested.

Upon this evidence supplied by the various federal, state and local officers, introduced over his motion to suppress and his objection, appellant was convicted. He contends that the evidence was illegally obtained by agents of the federal government in violation of the Fourth Amendment, and that it should have been excluded. The Government contends that the barn was not a part of appellant's curtilage and that, even if it was, the agents had the right to make the search on the ground that they had probable cause to make the search without a warrant.

 The barn here searched was a domestic building constituting an integral part of that group of structures making up the farm home. Every case must be decided upon its own peculiar facts[1], and we hold that, under the facts here, this barn was a part of the curtilage. In Taylor v. United States, 1931, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951, the house searched was a metal garage adjacent to the dwelling house; in Roberson v. United States, 6 Cir., 1948, 165 F.2d 752, the search was of a smokehouse; and in Walker v. United States, 5 Cir., 1942, 125 F.2d 395, 396, the search was of a shed consisting of a chicken house and garage, which stood fifty to sixty feet from the dwelling house; in each instance it was considered that the curtilage was involved.

In the Walker case the federal agents had found sacks of dry mash near the premises several days before the search and had smelled the odor of mash coming from the shed. After several days of waiting and watching without develop-

ments they came onto the premises announcing, " 'We have come for your still in that shed' ". The officers entered the enclosure in which the shed was situated and then entered the shed, where they found a still, mash and jugs of whiskey. We held that the search was of the residence, was illegal and that the evidence obtained thereby should have been suppressed. On the basis of these authorities we hold that appellant's barn was a part of the curtilage.

But it is plain that the search cannot be justified on any basis. The Fourth Amendment insures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures * * *". The Amendment further provides that no warrants shall issue, "but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized". The language of the Amendment is plain and its meaning clear.

In Johnson v. United States[2], the Supreme Court quotes from an older case these words: " 'It would not be possible to add to the emphasis with which the framers of our Constitution and this Court * * * have declared the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two [Fourth and Fifth] Amendments. The effect of the decisions cited is * * * that they [such rights] are to be regarded as of the very essence of constitutional liberty; and * * * that these amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or "gradual depreciation" of the rights secured by them, by imperceptible practice of courts or by well-intentioned, but mistakenly overzealous executive officers' ".

 In the same case Mr. Justice Jackson outlines the judicially created

---

1. Turner v. Camp, 5 Cir., 1941, 123 F. 2d 840.

2. 1948, 333 U.S. 10, 17, 68 S.Ct. 367, 370, 92 L.Ed. 436.

"exceptional circumstances" under which search without a warrant may be made without being condemned as an unreasonable search. These are limited to search as an incident to arrest, search of a movable vehicle and search which may be justified under rare circumstances to prevent threatened destruction or removal of contraband.

None of these exceptional circumstances are present here. The arrest of appellant followed and did not precede the search and was based upon the result of the illegal search. We are therefore not required to explore the controversy in progress between members of the Supreme Court as to the search which may attend a legal arrest[3]. No vehicle is involved and no removal of the contraband was possible, the officers being present and able to place guards at all exits.[4]

The Government takes the novel position that its officers had a perfect right to enter the barn and make a search solely because it claims that, based on the evidence above outlined, they had probable cause to believe that intoxicating liquors were being manufactured inside the barn. That contention is refuted by a number of recent Supreme Court decisions [5] where searches were held illegal even though the officers had grounds fully as good as those claimed here. The Johnson opinion further furnishes a sufficient answer to the Government's contention [6]; and the Supreme Court's pronouncement in Agnello v. United States, 269 U.S. 20 at page 32, 46 S.Ct. 4, 6, 70 L.Ed. 145, is also directly in point:

"The search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws. * * * Save on certain cases as incident to arrest, there is no sanction in the decisions of the courts, federal or state, for the search of a private dwelling house without a warrant. * * * Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no jus-

---

3. See e. g. Harris v. United States, 1947, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; Johnson v. United States, 1947, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; Trupiano v. United States, 1948, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663; McDonald v. United States, 1948, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153; United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653.

4. Cf. Johnson v. United States, supra; Trupiano v. United States, supra; McDonald v. United States, supra; and United States v. Jeffers, 1951, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59.

5. In Taylor v. United States, supra, officers entered a garage after smelling the odor of whiskey coming from it and after seeing stacks of cases therein. In Johnson v. United States, supra, officers received information from a known narcotics user and also smelled the "unmistakable" odor of burning opium, which odor was traced to the room searched. In Trupiano v. United States, supra, government agents smelled fermenting mash, heard a motor, and saw a whiskey still in operation in a barn. In McDonald v. United States, supra, officers heard the sound of an adding machine being used in a room and, through a transom of the room, saw a lottery being carried on. Despite such evidence of probable cause, the search, in each of the above cases was declared unreasonable.

6. 333 U.S. at pages 13–14, 68 S.Ct. at page 369:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. * * * When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."

tification for search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause."

The search and seizure here were unreasonable and in violation of the Fourth Amendment and the motion to suppress the evidence should have been sustained, and the evidence should have been excluded. Because the court below committed error in ruling against appellant in both instances, its judgment is reversed and the cause is remanded for further and not inconsistent proceedings.

Reversed.

RIVES, Circuit Judge.

I dissent.

RIVES, Circuit Judge (dissenting).

I respectfully dissent. This decision seems to me to be a serious blow to efficient law enforcement not required by the Fourth Amendment. The search and seizure, I think, were reasonable as incidental to the arrest of appellant, and if not, then most certainly as incidental to the arrest of his co-defendant, Johney Nunnally.

Before entering upon the appellant's premises, the officers had no information that there was a still in his barn, and hence they had no intention of searching the barn, but were headed direct for a search of the woods.[1] When within 30 to 60 feet of the barn, Officers Boone and Ferguson smelled the distinctive odor[2] of cooking mash (R. 25, 54), saw the black garden hose running beneath the edge of the barn, heard noises "like a can or drum hit the ground" and "a noise that sounded like somebody running" (R. 25). Boone and Ferguson immediately turned and ran to the barn (R. 54, 136), but before they could effect a capture, one man escaped. (R. pp. 42, 83, 103). Promptly upon entering the barn, the officers placed appellant's co-defendant, Johney Nunnally under arrest (R. 104). They later found Fred Walker, appellant's brother, hiding in a corn

---

1. Mr. Boone testified:

"Q. Now with regard to the source of your information, did they tell you that you would find a distillery out there in Mr. Walker's barn?

"A. No, it was vague and indefinite, said there might be something on the Clyde Walker place, that's the way I remember it." (R. 33)

On questioning by the court, he again testified:

"The Court: * * * Did you have any information that the whiskey or the still was in the barn before you all went out there?

"The Witness: No, sir, our information was that there was a still in the woods around his place, around his house there.

"The Court: From where you parked and the area, the way you were headed out there, the way you were headed, was that the direct route to the woods?

"The Witness: Yes, sir, direct short cut, right straight." (R. 61)

2. Boone testified on the hearing of the motion to suppress:

"Q. Describe that odor to the court, what kind of odor was it?

"A. In my experience of 5 years on this job I refer to it as cooking still mash. It has an acrid odor.

"Q. Mr. Boone, in the course of your work as an ATU investigator have you smelled cooking mash many times?

"A. Yes, sir, I have.

"Q. Does the odor of cooking mash, is it distinctive, as distinct from the smell or odor of fermenting mash?

"A. Generally, it is.

"Q. Is it distinctive as distinguished from the odor of ordinary moonshine whiskey?

"A. Yes, it is.

"Q. Is the odor of cooking mash distinctive in the sense that it occurs only when distilling operations are in progress?

"A. In a general way, that is the only thing that smells like cooking still mash, is cooking still mash." (R. 39, 40)

On the trial he testified:

"Q. Does cooking mash have a peculiar odor in your opinion?

"A. It has a distinctive odor that is all of its own. It has a mellow, more sour odor than a bakery would put out with yeast, but it is a distinct odor that an experienced investigator would recognize." (R. 81)

crib in the barn (R. 97, 149), but did not arrest him.

Appellant and Johney Nunnally were jointly indicted in four counts, each charging the commission of a felony as follows:

"Count One: Possession of unregistered still, 26 U.S.C.A. § 2810.

"Count Two: Carrying on business of distiller without bond, 26 U.S.C.A. § 2833.

"Count Three: Making mash, 26 U.S.C.A. § 2834.

"Count Four: Possession of 12 gallons of unstamped whiskey, 26 U.S.C.A. § 2803 (R. 1–2)."

In the district court, appellant brought out the fact that Johney Nunnally had pleaded guilty. (R. 104, 150.)

The district court, after a full and fair hearing, overruled the defendant's motion to suppress evidence, and in so doing made a finding of some facts, which finding is fully sustained by the record.[3]

The Fourth Amendment protects "The right of the people to be secure in their persons, *houses,* papers, and effects, against *unreasonable* searches and seizures" (emphasis supplied). It is settled that "houses" includes not only dwellings but offices and places of business.

Gouled v. United States, 255 U.S. 298, 305, 41 S.Ct. 261, 65 L.Ed. 647. On the other hand, as said by Mr. Justice Holmes in Hester v. United States, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898:

"* * * the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 Bl. Comm. 223, 225, 226."

See, also, Edwards v. United States, 10 Cir., 206 F.2d 855, 856.

In the same opinion, Mr. Justice Holmes further observed, "It is obvious that even if there had been a trespass, the above testimony was not obtained by an illegal search or seizure." 265 U.S. at page 58, 44 S.Ct. at page 446. As said by the Fourth Circuit in Janney v. United States, 206 F.2d 601, 604, "The fact that the officers were trespassers on the defendant's property was thought to be immaterial." In Koth v. United States, 16 F.2d 59, 61, the Ninth Circuit said: "The fact that the officers may have been trespassers does not exclude the evidence after what they saw, heard and smelled."[4] In United States v. Rogato,

3. "After a careful review of the authorities, the court is of the opinion that the motion should be overruled. McBride v. United States, 5 Cir., 284 F. 416; Schulte v. United States, 5 Cir., 11 F.2d 105; Schnorenberg v. United States, 7 Cir., 23 F.2d 38; Carney v. United States, 9 Cir., 163 F.2d 784.

"The search undertaken did not result alone from the odor of fermenting mash. As the officers were crossing the barnyard they observed a strong odor of cooking mash and as they approached the barn they saw a garden hose extending from beneath the barn across the barnyard lot. About the time they reached the barn door they heard a disturbance within as though someone was attempting to flee from the barn. There was a distinct noise from within the barn that sounded like utensils or some other objects being upset. Before reaching the farm, the officers had no information whatever that a still was being operated in the barn. The evidence indicates that

the information which the officers obtained pointed to the fact that a still was being operated in the woods on the farm. The officers stated they were on their way to one section of the wooded area in a direct line across the barnyard when they first detected the odor of mash." (R. 71, 72)

4. The necessity for not including a mere trespass on land within the prohibition of the Fourth Amendment was picturesquely stated by Judge Yankwich in Taylor v. Fine, D.C.S.D.Cal., 115 F. Supp. 68, 71:

"If it were possible to submit officers of the United States Immigration Service to harassment every time they search for illegal entrants, if they could be subjected to suits even for nominal damages, the landowners of the Coachella district would be erecting barriers against the United States Government, and, in effect, telling the officers of the Government, 'Do not enter, no matter what federal

D.C.M.D.Pa., 39 F.2d 171, 175, the Court said: "Nor does the special protection accorded by the Fourth Amendment extend to the open driveways on each side of the building, or the open space in the rear of the building."

Neither the Supreme Court nor any Federal Court of Appeals has ever held that the word "houses" includes open land even within the curtilage of a dwelling. The state courts of Kentucky and of Mississippi, which have held that the land within the curtilage is protected, based their decisions on the word "possessions" appearing in the Constitutions of those States,[5] but not contained in the Fourth Amendment. It will be observed that in the Supreme Court case of Hester v. United States, supra, the officers were concealed prior to the search only 50 to 100 yards from the dwelling. In Martin v. United States, 5 Cir., 155 F.2d 503, 505, Judge Lee speaking for this Court said: "Enclosed or unenclosed grounds or open fields around their houses are not included in the prohibition."

Under the facts of this case, I doubt the correctness of the holding that, "this barn was a part of the curtilage," but I am not convinced that the "curtilage" test is the right one. It would imply protection to the open spaces of the lot, and such an extreme position cannot soundly be maintained. It would imply, also, that buildings outside the curtilage are *not* within the protection of the Fourth Amendment, and, while I am aware of cases so holding,[6] I can see no reason why a farmer should be afforded less protection in the barn where he actually does business, whether located within the curtilage or not, than is accorded a city dweller in his office. A more accurate statement of the rule, I think, was made by the Fourth Circuit in the recent case of Janney v. United States, supra, 206 F.2d at page 603:

"We bear in mind that the protection of the Amendment extends not only to the dwelling house of a defendant but also to the structures used by him in connection with his home or his place of business."

While I thus disagree with the "curtilage" test employed by my brothers, I am in accord with their conclusion that appellant's barn was afforded the protection of the Fourth Amendment. When, however, it comes to a question of degree, of "when the right of privacy must reasonably yield to the right of search",[7] it seems to me that any attempt to equate a man's barn with his dwelling must lower the dignity of the latter, and that his home more appropriately meets the description of his castle, of his cottage into which even the King's men may not enter. In United States v. Rabinowitz, 339 U.S. 56, 64, 70 S.Ct. 430, 94 L.Ed. 653, the Supreme Court recognized that even though a structure came within the protection of the Amendment, the character of the place was properly to be considered in determining whether the search was reasonable. In our own recent case of Drayton v. United States, 205 F.2d 35, 36, this Court recognized that:

"Although stricter requirements of reasonableness may apply where

laws are violated.' Under the protection of barbed-wire fences, they could thus employ aliens illegally in the country and aid law violations."

5. Fugate v. Commonwealth, 294 Ky. 410, 171 S.W.2d 1020, 1021; Mullins v. Commonwealth, 220 Ky. 656, 295 S.W. 987; Childers v. Commonwealth, 198 Ky. 848, 250 S.W. 106, 107; Cotton v. Commonwealth, 200 Ky. 349, 254 S.W. 1061, 1062; Barnard v. State, 155 Miss. 390, 124 So. 479; Helton v. State, 136 Miss. 622, 101 So. 701; Falkner v. State, 134 Miss. 253, 98 So. 691.

6. See cases cited in 79 C.J.S., Searches and Seizures, § 14. As Judge Alger Fee notes in United States v. Vlahos, D.C. Or., 19 F.Supp. 166, 169, there is a marked conflict in the decisions as to buildings outside the curtilage. Of course, if there is no occupant of the premises, the barn would not be protected, Tritico v. United States, 5 Cir., 4 F.2d 664.

7. Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436.

a dwelling is being searched, compare Davis v. United States, 328 U.S. 582, (592), 66 S.Ct. 1256, 90 L.Ed. 1453; Matthews v. Correa, 2 Cir., 135 F.2d 534, 537, * * *."

That language appears to have been taken directly from Harris v. United States, 331 U.S. 145, 151, footnote 15, 67 S.Ct. 1098, 91 L.Ed. 1399.

From my brothers' conclusion that the search was an *"unreasonable"* one, I respectfully but vigorously dissent.

"What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case. Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed 374. Reasonableness is in the first instance for the District Court to determine." United States v. Rabinowitz, supra, 339 U.S. at page 63, 70 S.Ct. at page 434.

That case overruled Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, to the extent that Trupiano required a search warrant *solely* upon the basis of the practicability of procuring it, but we held in Rent v. United States, 5 Cir., 209 F.2d 893, 899, that the practicability of procuring a search warrant is still *one* of the factors to be considered in deciding whether a search without a warrant is reasonable. My

brothers think that there was time to procure a search warrant because the officers were "present and able to place guards at all exits." To me this case does not present so leisurely a picture.[8] Before they could do so, one of the culprits escaped, another hid in the corn crib, and appellant's co-defendant Johney Nunnally was attempting to escape. Further, what were such guards to do? Were they to stand helplessly by while the operators of the illicit still fled? If they had sufficient information on which to confine the occupants of the barn to that structure or to arrest them as they fled, then it seems to me that they had authority to enter the barn for that purpose. My brothers say, however, that "no removal of the contraband was possible." Even that does not seem to me to be so, for pouring illicit whiskey or liquid mash down an underground drain is perhaps a common experience suffered by law enforcement officers.

The Rabinowitz case, as well as a long line of cases, recognizes "The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made * * *." Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 5.

My brothers say, "The arrest of appellant followed and did not precede the search and was based upon the result of the illegal search." I do not think so, as I will point out in a moment. However, assuming that to be so, then what about the arrest of Johney Nunnally? He has never even questioned the validity of his

---

8. No minute search was necessary because the evidence was obvious. As testified by Mr. Boone:

"Q. When you went in what did you find?

"A. In the barn?

"Q. Yes.

"A. A 100 gallon tank type still that had been in operation, except the cover had been rolled off the top; several barrels of mash, a complete distillery, and a man later identified as Johney Nunnally who I arrested as he was trying to get

out the back door. Somebody had already done gotten out.

"Q. Was there anybody else in the barn besides Nunnally?

"A. Not that I could identify. There was another man there going out the door.

"Q. Did you find anybody else in the barn?

"A. Later we did.

"Q. Who?

"A. This fellow's brother, Fred Walker.

"Q. Did you put him under arrest?"

arrest, but to the contrary, has pleaded guilty. If the search was lawful as incidental to the arrest of appellant's co-defendant, it could hardly be unlawful as to the appellant. See United States v. Jeffers, 342 U.S. 48, 51, 52, 72 S.Ct. 93, 96 L.Ed. 59; McDonald v. United States, 335 U.S. 451, 454, 69 S.Ct. 191, 93 L.Ed. 153; It seems to me, as said by Mr. Justice Black, concurring in Wolf v. Colorado, 338 U.S. 25, 39, 40, 69 S.Ct. 1359, 1367, 93 L.Ed. 1782, "* * * that the federal exclusionary rule is not a command of the Fourth Amendment but is a judicially created rule of evidence which Congress might negate." It is a rule that evidence gained by the Government's own wrong shall not be used. Cf. United States v. Wallace & Tiernan Co., 336 U.S. 793, 796, 69 S.Ct. 824, 93 L.Ed. 1042. If then the evidence was *legally* obtained, it is immaterial whether such legality is referable to its connection with appellant's arrest or to the arrest of his co-defendant.

Officer Boone testified:

"Q. How long was it from the time you first entered then until you went in there and put Johney Nunnally under arrest?

"A. The time it would take to walk from that opening into the barn, to hesitate a moment, and go in there. I would say not more than a minute or a minute and a half.

"Q. And how long did you stay in the barn after you got in there, before you walked back out of the barn?

"A. I came right back out to the front and called Walker down there."

The appellant was then placed under arrest.[9] I do not think that we are required nicely to calculate whether the search preceded the arrest, if the two acts were practically simultaneous and the officers had probable cause for believing that one or more of the arrested persons had committed a felony. See Annotations, 74 A.L.R. 1391; 51 A.L.R. 429; 82 A.L.R. 784.

Certainly the arrest of Johney Nunnally was lawful whether measured by federal or state standards. As said by Chief Justice Taft in Carroll v. United States, 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543: "The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony * * *." The briefs do not cite us to the authorities as to whether agents of the Alcohol Tax Unit have power to make arrests. United States Marshals, Agents of the Federal Bureau of Investigation and certain other federal officers are authorized to arrest if they have reasonable grounds to believe that the person arrested has committed or is committing a felony. 18 U.S.C.A. §§ 3050 to 3054, inclusive. Under Alabama State law also, an officer may arrest any person without a warrant "when he has reasonable cause to believe that the person arrested has committed a felony." Alabama Code of 1940, Title 15, § 154. A private person has authority to make arrests "where a felony has been committed, though not in his presence, by the person arrested; or where a felony has been committed, and he has reasonable cause to believe that the person arrested committed it * * *." Id. Section 158. If federal statutes or regulations do not specifically authorize agents of the Alcohol Tax Unit to make

9. As testified by Mr. Boone:
"A. I signaled him to come down there, and he came down, and I shook hands with him and introduced myself and told him who I was, and that he was under arrest.
"Q. How long was that after you searched the premises?
"A. If you call that a search, it was within two minutes or less.
"Q. After you went in there and found the property, the still, it was immediately after you walked out, you caught him and put him under arrest?
"A. Yes, sir."

arrests, the Alabama statute provides the standard by which the legality of these arrests must be measured. United States v. Di Re, 332 U.S. 581, 591, 68 S.Ct. 222, 92 L.Ed. 210; Johnson v. United States, 333 U.S. 10, 15, note 5, 68 S.Ct. 367, 92 L.Ed. 436; Rent v. United States, 5 Cir., 209 F.2d 893, 897, 900. By any standard, it seems to me that the legality of the arrest of Johney Nunnally cannot be questioned, and there is but slight ground on which to question the legality of appellant's arrest.

When the officers smelled, saw and heard the things which reasonably indi-

cated to them that an illicit still was being operated in the barn, one of them ran for the front door and the other for the rear door to head off and capture those committing the felony. Their actions showed that their object was to make the arrests. The participants in crime so understood for, as has been stated, one of them escaped, Johney Nunnally tried to escape (R. 104) but was arrested, and Fred Walker hid in the corn crib.

There are a number of almost "gray horse" cases.[10] I respectfully submit

10. In Donahue v. United States, 9 Cir., 56 F.2d 94, 97, it was said:

"The illegal manufacture of liquor is a felony. Act of March 2, 1929 (Jones Act, 45 Stat. 1446, 27 U.S.C.A. §§ 91, 92). If the information which had reached the officers prior to the arrest and search, that is, prior to the opening of the door of the dwelling house, and the knowledge they had gained through their senses of smell and hearing, was sufficient to give them probable cause to believe that a felony was being committed in their presence, they were entitled to enter the dwelling and make the arrest, United States v. Borkowski (D.C.) 268 F. 408; McBride v. United States, 5 Cir., 284 F. 416; Janus v. United States, 9 Cir., 38 F.2d 431, 436; 28 U.S.C.A. § 504, and, as an incident thereof, search the premises, United States v. Borkowski, supra, D.C., 268 F. 408; Vachina v. United States, 9 Cir., 283 F. 35; McBride v. United States, supra, 5 Cir., 284 F. 416. See, also, Garske v. United States, 8 Cir., 1 F.2d 620, and cases there collated. That they had reasonable cause to believe that a felony was being committed in their presence is clear, and they therefore had a right to enter the premises for the purpose of making an arrest, and, as an incident thereto, to seize property found in appellant's control, which it was unlawful for him to have. Carroll v. United States, 267 U.S. 132, 161, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790; Marron v. United States, 275 U.S. 192, 198, 199, 48 S.Ct. 74, 72 L.Ed. 231; King v. United States, 9 Cir., 1 F.2d 931; Mattus v. United States, 9 Cir., 11 F.2d 503."

See also Kelley v. United States, 8 Cir., 61 F.2d 843; United States v. Solomon, D.C.Mass., 33 F.2d 193.

In United States v. Kronenberg, 2d Cir., 134 F.2d 483, a Court composed of Judges Learned Hand, Augustus N. Hand, and Frank said per curiam:

"We have never held, and it would be absurd to hold, that the sense of smell was not to be relied upon at all; all we have ever said was that, standing alone, it is not enough. Here it did not stand alone, for all the evidence, taken together, justified the conclusion that, when the officer went down the fire escape, his presence had been observed when the light was put out; and that what Walker carried from the apartment to the incinerator was something the detection of which he wished to avoid. It was, further, a reasonable conclusion from this that this was the opium which smelled so strong."

McBride v. United States, 5 Cir., 284 F. 416, relied on by the district court, is directly in point. There Judge King, speaking for a court composed of Judges Walker, Bryan and King, said:

"Treating this stable as falling within the description of places covered by the Fourth Amendment, the question in this case is: Can an officer, without warrant, enter upon premises whereon he is informed by his senses a crime is being committed, and, having entered, finding a crime in progress, without warrant arrest the offenders and testify as to what such entry discloses? * * *

"The entry on these premises and into the stable was not to search for evidence, but, upon ascertaining that whisky was in process of manufacture thereon, to arrest those engaged in the commission of an offense then in progress. If an entry can be made without warrant in cases where the officers acquire information evidencing the present commission of a

that the cases relied on by my brothers do not hold or tend to the contrary. Let me briefly discuss each of them in the order in which it is cited in the opinion. Turner v. Camp, 5 Cir., 123 F.2d 840, is cited merely to the point that every case must be decided upon its own peculiar facts, with which all must agree. In Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 467, where a garage adjacent to a city residence was searched, the Court repeatedly pointed out, "No one was within the place, and there was no reason to think otherwise", and again:

"Prohibition officers may rely on a distinctive odor as a physical fact indicative of possible crime; but its presence alone does not strip the owner of a building of constitutional guarantees * * * against unreasonable search. This record does not make it necessary for us to discuss the rule in respect of searches in connection with an arrest. No offender was in the garage; the action of the agents had no immediate connection with an arrest. The purpose was to secure evidence to support some future arrest." Taylor v. United States, supra, 286 U.S. at page 6, 52 S.Ct. at page 467.

The Roberson case, 6 Cir., 165 F.2d 752, relates only to the question of whether the barn was a "house" within the protection of the Fourth Amendment, and upon that question we are in substantial agreement. In the Walker case, 5 Cir., 125 F.2d 395, the information on which the search was made was obtained several days theretofore. Likewise, in Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436, a five to four decision, the informer had reported to the officers "that unknown persons were smoking opium in the Europe Hotel. The informer was taken back to the hotel to interview the manager, but he returned at once saying he could smell burning opium in the hallway." 333 U.S.

at page 12, 68 S.Ct. at page 368. The Court commented that, "No suspect was fleeing nor likely to take flight", 333 U.S. at page 15, 68 S.Ct. at page 369. In Harris v. United States, 331 U.S. 145, 67 S. Ct. 1098, 91 L.Ed. 1399, the search was held reasonable as incident to an arrest. In Trupiano v. United States, 334 U.S. 699, 706, 68 S.Ct. 1229, 1233, 92 L.Ed. 1663, "The agents of the Alcohol Tax Unit knew every detail of the construction and operation of the illegal distillery long before the raid was made." That case, as has been commented, has been overruled in part. In McDonald v. United States, 335 U.S. 451, 455, 69 S.Ct. 191, 193, 93 L.Ed. 153, the officers heard the adding machine, looked over a transom and saw what was transpiring in the room, all without being discovered. The defendant and his rooming house had been kept under surveillance for two months. The Court specifically commented, "Here, as in Johnson v. United States and Trupiano v. United States, the defendant was not fleeing or seeking to escape." In United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 435, the judgment of the Court of Appeals was reversed, and the Supreme Court held that, "The motion to suppress the evidence was properly denied by the District Court." In United States v. Jeffers, 342 U.S. 48, 52, 72 S.Ct. 93, 96 L.Ed. 59, the Government admitted that the search of the hotel room was unlawful as to the Misses Jeffries, but contended that it did not invade the respondent's privacy. The Supreme Court thought that that was "a quibbling distinction", 342 U.S. 52, 72 S.Ct. 95. Conversely, here, if the search was lawful as to Johney Nunnally, I submit that it was lawful as to the appellant. In Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, the search was not incidental to an arrest, but was of a man's dwelling several blocks distant from the place of his arrest, after the offense had been committed and while he was in custody elsewhere. The fore-

crime, then the use of knowledge acquired by such entry is not the use of

knowledge illegally acquired." 284 F. at pages 418, 419.

going are all of the authorities upon which the majority relies. Not one of them, I submit, sustains the present ruling.

The evidence against the appellant was so unanswerable that he offered no witnesses in his own behalf. It is a serious matter that a man undeniably guilty of felonious crimes should go unwhipped of justice. It is far more serious that we should establish a precedent under which conscientious and vigilant law enforcement officers will be seriously impeded in the performance of their important duties. Rightly understood, the Fourth Amendment requires extra precautions on the part of officers before searching houses, but it is not a bulwark behind which the lawless may seek shelter. Cf. Johnson v. United States, 333 U.S. 10, 13, 14, 68 S.Ct. 367. As said in United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, " * * * the Amendment does not place an unduly oppressive weight on law enforcement officers but merely interposes an orderly procedure under the aegis of judicial impartiality that is necessary to attain the beneficient purposes intended." To construe it otherwise is to make the Amendment itself a force for evil rather than for good, and to plant in it a cancer which ultimately may bring about its destruction. I, therefore, respectfully dissent.

On Petition for Rehearing

Before RIVES and CAMERON, Circuit Judges, and DAWKINS, District Judge.

PER CURIAM.

Upon considering the petition for rehearing and neither judge who voted to reverse the judgment of the court below desiring or advocating that the petition for rehearing be granted; it is ordered and decreed that the petition for rehearing be and it is

Denied.

RIVES, Circuit Judge.

I dissent.