**Rudolf GIL**

v.

**Dr. George BETO, Director, Texas Department of Corrections.**

**Civ. A. No. A–70–CA–20.**

United States District Court, W. D. Texas, Austin Division.

Oct. 6, 1970.

Rudolf Gil, pro se.

Crawford C. Martin, Atty. Gen., of Tex., Austin, Tex., for defendant-respondent.

### MEMORANDUM OPINION AND ORDER

ROBERTS, District Judge.

In this application for relief pursuant to 28 U.S.C. § 2254, petitioner seeks to set aside his convictions in State court for possession of narcotics paraphernalia and being a habitual criminal, on the ground that evidence obtained through an illegal search and seizure was admitted at his trial. Petitioner's convictions and life sentence were handed down on January 5, 1965, and affirmed by the Texas Court of Criminal Appeals, Gil v. State, 394 S.W.2d 810 (Tex.Cr.App. 1965). On October 15, 1969, the state convicting court denied a petition for writ of habeas corpus without an evidentiary hearing; on January 20, 1970, the Texas Court of Criminal Appeals denied the petition without written order. Having thus exhausted state remedies, petitioner renews his contentions here. For the reasons that follow, this Court also DENIES relief.

The evidence objected to at trial and on appeal in the state courts consisted of the testimony of three police officers as to observations they made of petitioner

through a motel cabin window and the paraphernalia seized in the ensuing arrest. The facts are well summarized by the Texas Court of Criminal Appeals:

"At about 9 p. m. on July 27, 1964, three officers of the Austin Police Department entered cabin number 2 at the Jackson Courts in East Austin. They had been informed by the motel owner that appellant and a companion, Jesse Capuchino, had checked into cabin number 1, and the owner had granted the officers permission to occupy cabin number 2 for the purpose of surveillance of activities in the adjoining cabin. Capuchino had a record of prior convictions for narcotics violations, and Lt. Gann, one of the officers in cabin number 2, testified that he was familiar with Capuchino's reputation and 'had people who were keeping me up-to-date with his activities.'

In order to see into cabin 1, Lt. Gann stood on a graveled walkway alongside that cabin and looked through a window, the venetian blinds of which were partially opened and in need of repair. Appellant and his companion showered and left the motel, returning at about 11:30 p. m. From his vantage point at the window, Lt. Gann observed Capuchino open a package containing narcotic paraphernalia which he took into the bathroom out of the sight of the officer. Appellant meanwhile opened the closet door, removed his shirt and reached up inside the door frame. When Capuchino emerged from the bathroom, placing the paraphernalia on the dresser, appellant picked up an eye dropper and hypodermic needle and went into the bathroom.

At this juncture, Lt. Gann and his fellow officers prepared to enter the cabin and, in doing so, alerted Capuchino, who resisted the officers' efforts to come through the door. After forcing their way into the room, the officers arrested the pair, but Capuchino momentarily freed himself, went into the bathroom, and flushed the commode. The officers found the hypodermic needle in the commode, a bottle cap containing heroin on the dresser, and gelatin capsules and sugar above the door in the closet; the eye dropper syringe was not found. Lt. Gann testified that appellant was languid and lethargic, the pupils of his eyes were pin-pointed, his arms bore fresh needle marks. In the officer's opinion, both appellant and his companion were under the influence of narcotics." Gil v. State, supra at 810–811.

To this should be added that at no time did any of the officers have an arrest or search warrant. Prior to looking through the window, Lt. Gann had heard water running in cabin 1 and had recognized an automobile parked in the adjacent carport as Capuchino's. He made at least two trips to the window before he observed Capuchino unwrapping the paraphernalia. He admitted, however, that until he saw the paraphernalia he did not think he had sufficient probable cause to obtain a warrant.

■ Petitioner raises no allegations inconsistent with the foregoing facts, and after a careful study of the record, this Court is satisfied that the state court reliably found the relevant facts after a full hearing. Accordingly, no necessity for an evidentiary hearing exists under the criteria of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

■ However, this Court may not similarly defer to the state court's conclusions of law, but must instead apply the proper federal law independently. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). Petitioner contended in the State courts that the officers were within the curtilage of his premises when they first observed the criminal activity inside the cabin, and that they violated his right to be left alone guaranteed by the Fourth Amendment when they looked through the window. In affirming petitioner's convictions, the Texas Court of Criminal Ap-

peals viewed the gravel walkway as part of the grounds of the motel where by virtue of the owner's permission the officers had a right to be, and held that the seizure of the evidence was an incident to the lawful arrest of a person observed by the arresting officer in the commission of a felony. Gil v. State, *supra*, 394 S.W.2d at 811–812.

■■ Few would doubt that surveillance, by definition an expectant watching, constitutes a search. The often difficult task of the courts has been to determine, in those cases where the officer's eye has fallen upon illegal activity, whether under the particular circumstances the surveillance employed was unreasonable and therefore an invasion of the privacy assured to innocent and guilty alike by the Fourth Amendment. The law demands the exclusion of evidence obtained through an unreasonable search when such evidence is tendered in court. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Thus, in McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), the Supreme Court directed the suppression of evidence seized by police officers after breaking into a rooming house without warrant or permission of the owner and observing an illegal gambling operation by peering from a common hallway through an open transom into a room that had been rented by the arrestees. Similarly, in Brock v. United States, 223 F.2d 681 (5th Cir. 1955), the court of appeals set aside a conviction resulting in part from evidence seized after an officer had stood upon the grounds of a private residence, observed the sleeping defendant through an open window, and elicited incriminating statements from him before he awoke. Citing McDonald v. United States, *supra*, the court said, "Whatever quibbles there may be as to where the curtilage begins and ends, clear it is that standing on a man's premises and looking in his bedroom window is a violation of his 'right to be

left alone' as guaranteed by the Fourth Amendment." 223 F.2d, at 685. In 1967, the Supreme Court dispelled such "quibbles", at least as to evidence obtained by electronic eavesdropping, by holding in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), that the reach of the Fourth Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure, but rather requires only an "actual intrusion into a constitutionally protected area." See also, Berger v. State of New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). This principle was applied to visual searches in State of Texas v. Gonzales, 388 F.2d 145 (5th Cir. 1968) a case very similar to the situation presented here. Acting on prior information that the occupants of a private residence in Austin were sellers of narcotics, but without a valid search or arrest warrant, the same Lt. Gann stood on a drainpipe, peered through a window of the residence, and discovered the occupants working with narcotics. He subsequently forced entry, arrested the occupants, and seized heroin and paraphernalia. In affirming the district court's decision to grant relief from a conviction obtained on this evidence, the court of appeals held that Lt. Gann conducted an illegal search because he first looked through the window at a time when he lacked probable cause to think that narcotics were possessed in the home. Relying heavily upon Katz v. United States, *supra*, the court expressly declined to base its decision on the ground that the curtilage had been invaded and rejected the argument that the subsequent arrest could justify the search which made the arrest possible. "(T)he police conduct in this case amounted to the sort of fishing expedition for evidence that the fourth amendment was designed to eliminate." 388 F.2d, at 148. The only significant difference between petitioner's case and State of Texas v. Gonzales, *supra*, is that here the officers conducted their search of the cabin from a vantage point where they had a right to be rather than

from the grounds of a private residence where they could rightfully be only by invitation or upon probable cause. If the courts are now "to avoid the fictional question of where the curtilage begins and ends," and if the sort of search that took place in this case can no longer be justified by the subsequent arrest, State of Texas v. Gonzales, *supra*, at 147, 148, it may well be that had the judgment in petitioner's case become final after the date of the decision in *Gonzales*, his petition would have to be granted. But, as will be shown, to do so now would require that *Gonzales* be given retroactive effect, a course this Court believes to be foreclosed by numerous federal decisions.

■ The Supreme Court has spoken of three factors to be considered in determining the retroactivity of new constitutional standards in criminal law: (a) the purpose to be served by the new standards; (b) the extent of reliance by law enforcement authorities on the old standards; and (c) the effect on the administration of justice of a retroactive application of the new standards. Desist v. United States, 394 U.S. 244, 249, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); Stovall v. Denno, 388 U.S. 293, 296, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1966). Thus in Linkletter v. Walker, *supra*, the Court denied retroactive effect to its decision in Mapp v. Ohio that federal constitutional standards for searches and seizures were applicable in state court proceedings. Observing that the central purpose of excluding illegally-seized evidence is to deter lawless action by the police, and that the privacy of persons victimized by prior police conduct cannot be restored, the Court stated that the wholesale release of guilty prisoners would serve no purpose of the exclusionary rule and would place an unacceptable administrative burden on the courts. In Desist v. United States, *supra*, the Court employed similar reasoning to hold that *Katz* was not to be applied retroactively. Moreover, the circuits have uniformly

held that the recent decision in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), holding that a search without warrant but incidental to a lawful arrest must be limited to the arrestee's person and the area within his immediate control, is not to be retroactively applied. See, *e. g.*, Williams v. United States, 418 F.2d 159 (9th Cir. 1969); Lyon v. United States, 416 F.2d 91 (5th Cir. 1969); United States v. Bennett, 415 F.2d 1113 (2d Cir. 1969). From the foregoing authorities this Court concludes that as a general rule a case expanding the Fourth Amendment's protection against unlawful searches and seizures is not to be given retroactive application to other cases in which the judgment became final prior to the date of the case announcing the new rule.

■ Insofar as the principles governing retroactivity are concerned, no distinguishing factor appears to place the *Gonzales* case outside the general rule. The purpose to be served by abandoning the concept of curtilage was plainly to control the conduct of the police in making visual searches. Moreover, at the time petitioner's convictions became final in 1965, the concept of curtilage played an often decisive role in federal and state decisions determining the reasonableness of searches of residences and private buildings. See, *e. g.*, United States v. Mullin, 329 F.2d 295 (4th Cir. 1964); Weaver v. United States, 295 F.2d 360 (5th Cir. 1961); Polk v. United States, 291 F.2d 230 (9th Cir. 1961); Hobson v. United States, 226 F.2d 890 (8th Cir. 1955); Walker v. United States, 225 F.2d 447 (5th Cir. 1955); Roberson v. United States, 165 F.2d 752 (6th Cir. 1948); Giacona v. State, 372 S.W.2d 328 (Tex.Cr.App.1962), cert. denied, 375 U.S. 843, 84 S.Ct. 92, 11 L.Ed.2d 70 (1963); Eversole v. State, 106 Tex.Cr.R. 567, 294 S.W.2d 210 (1927). It therefore appears that at the time the police searched petitioner's cabin they had good reason to believe that what they were doing was lawful. Finally, no difference can be perceived between the

*Gonzales* case and the decisions in *Mapp*, *Katz* and *Chimel* in terms of the administrative burden on the courts that would be likely to result from retroactive application. Since the judgment in petitioner's case became final prior to the decisions in *Katz* and *Gonzales*, the petition must be denied.

It is accordingly, ordered, adjudged and decreed that Petitioner's Petition for Writ of Habeas Corpus be, and is hereby, denied.