## UNITED STATES v. ROGATO.
### No. 5743.

District Court, M. D. Pennsylvania.
March 7, 1930.

Andrew B. Dunsmore, of Wellsboro, Pa., for the United States.

Walter W. Kohler, of Scranton, Pa., for defendant.

WATSON, District Judge.

This is a rule to show cause why evidence obtained by federal prohibition agents in the search of property at 271 River street, Plains, Pa., should not be suppressed. The search was made by Federal Prohibition Agents Loos and Flood on the 18th day of July, 1929, at about 2 o'clock p. m. The facts leading up to the search and seizure were as follows:

Flood had been informed that the open space in the rear of 271 River street, Plains, Pa., was an "unloading place" for liquor. About a month previous to July 18th, he saw Louis Hornfeld there and a truck in which there were baskets of empty quart bottles. He told Hornfeld and others there at the time that if they did not stop unloading and transferring liquor and whisky at that place, he was going to get them, and about twice a week thereafter he visited and looked the place over.

On July 18th, Loos and Flood, when passing 271 River street, Plains, saw from River street the front ends of two automobile trucks in the rear of the building. The open space in the rear of the building was reached from River street by a driveway on each side of the building located on the premises. One of the trucks was facing south and the other was facing north, which indicated to the officers that they were backed up end to end in the usual position for transferring articles from one truck to the other. Loos and Flood went to the rear of the building where the trucks were, and they saw on the trucks pasteboard containers or cartons which they recognized from their experiences as prohibition agents as containers commonly used to cover cans of alcohol when being transported. William Rogato, the defendant, was handing one of the containers from the truck in which he was to Hornfeld, who was in the other truck. Both Rogato and Hornfeld said that they did not know what the pasteboard covered cans contained. Loos opened one of

the cans, and found from the taste and smell that it contained alcohol fit for beverage purposes in excess of one-half of one per cent. alcohol. On one of the trucks there were one hundred and three five-gallon cans of alcohol, and on the other truck there were eighty five-gallon cans of alcohol. Rogato and Hornfeld were placed under arrest and the truck of alcohol seized.

■ The attorney for the defendant contends that the search of the truck was made without probable cause for such search.

The Fourth Amendment to the Constitution does not denounce all search and seizures but only such as are unreasonable.

The Fourth Amendment is in part as follows: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

Section 26, title 2, National Prohibition Act (27 USCA § 40), under which the seizure herein was made, provides in part as follows: "When the commissioner, his assistants, inspectors, or any officer of the law shall discover any person in the act of transporting in violation of the law, intoxicating liquors in any wagon, buggy, automobile, water or air craft, or other vehicle, it shall be his duty to seize any and all intoxicating liquors found therein being transported contrary to law. Whenever intoxicating liquors transported or possessed illegally shall be seized by an officer he shall take possession of the vehicle and team or automobile, boat, air or water craft, or any other conveyance, and shall arrest any person in charge thereof."

In Carroll v. United States, 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790, Chief Justice Taft in the opinion of the court said:

Page 147 of 267 U. S., 45 S. Ct. 280, 283, 69 L. Ed. 543, 39 A. L. R. 790: "The intent of Congress to make a distinction between the necessity for a search warrant in the searching of private dwellings and in that of automobiles and other road vehicles in the enforcement of the Prohibition Act is thus clearly established by the legislative history of the Stanley Amendment. Is such a distinction consistent with the Fourth Amendment? We think that it is. * * * "

Page 149 of 267 U. S., 45 S. Ct. 280, 283, 69 L. Ed. 543, 39 A. L. R. 790: "On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid. The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens. * * * "

Page 153 of 267 U. S., 45 S. Ct. 280, 285, 69 L. Ed. 543, 39 A. L. R. 790: "We have made a somewhat extended reference to these statutes to show that the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought. * * * "

Page 158 of 267 U. S., 45 S. Ct. 280, 287, 69 L. Ed. 543, 39 A. L. R. 790: "As the main purpose of section 26 was seizure and forfeiture, it is not so much the owner as the property that offends. Agnes v. Haymes, 141 F. 631, 641, 72 C. C. A. 325. The language of the section provides for seizure when the officer of the law 'discovers' any one in the act of transporting the liquor by automobile or other vehicle. Certainly it is a very narrow and technical construction of this word which would limit it to what the officer sees, hears or smells as the automobile rolls by and exclude therefrom when he identifies the car, the convincing information that he may previously have received as to the use being made of it. * * * "

Page 159 of 267 U. S., 45 S. Ct. 280, 287, 69 L. Ed. 543, 39 A. L. R. 790: "Finally, was there probable cause? In The Apollon, 9 Wheat. 362, 6 L. Ed. 111, the question was whether the seizure of a French vessel at a particular place was upon probable cause that she was there for the purpose of smuggling. In this discussion Mr. Justice Story, who delivered the judgment of the court, said (page 374 [of 9 Wheat., 6 L. Ed. 111]): 'It has been very justly observed at the bar that the court is bound to take notice of public

facts and geographical positions, and that this remote part of the country has been infested, at different periods, by smugglers, is a matter of general notoriety, and may be gathered from the public documents of the government.'"

Page 160 of 267 U. S., 45 S. Ct. 280, 287, 69 L. Ed. 543, 39 A. L. R. 790: "We know in this way that Grand Rapids is about 152 miles from Detroit, and that Detroit and its neighborhood along the Detroit river, which is the international boundary, is one of the most active centers for introducing illegally into this country spirituous liquors for distribution into the interior. It is obvious from the evidence that the prohibition agents were engaged in a regular patrol along the important highways from Detroit to Grand Rapids to stop and seize liquor carried in automobiles. They knew or had convincing evidence to make them believe that the Carroll boys, as they called them, were so-called 'bootleggers' in Grand Rapids; i. e., that they were engaged in plying the unlawful trade of selling such liquor in that city. The officers had soon after noted their going from Grand Rapids half way to Detroit, and attempted to follow them to that city to see where they went, but they escaped observation. Two months later these officers suddenly met the same men on their way westward presumably from Detroit. The partners in the original combination to sell liquor in Grand Rapids were together in the same automobile they had been in the night when they tried to furnish the whisky to the officers, which was thus identified as part of the firm equipment. They were coming from the direction of the great source of supply for their stock to Grand Rapids, where they plied their trade. That the officers, when they saw the defendants, believed that they were carrying liquor, we can have no doubt, and we think it is equally clear that they had reasonable cause for thinking so. Emphasis is put by defendants' counsel on the statement made by one of the officers that they were not looking for defendants at the particular time when they appeared. We do not perceive that it has any weight. As soon as they did appear, the officers were entitled to use their reasoning faculties upon all the facts of which they had previous knowledge in respect to the defendants. * * *"

Page 161 of 267 U. S., 45 S. Ct. 280, 288, 69 L. Ed. 543, 39 A. L. R. 790: "If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed, it is sufficient. * * *"

Page 161 of 267 U. S., 45 S. Ct. 280, 288, 69 L. Ed. 543, 39 A. L. R. 790: "The substance of all the definitions is a reasonable ground for belief in guilt. * * *"

Page 162 of 267 U. S., 45 S. Ct. 280, 288, 69 L. Ed. 543, 39 A. L. R. 790: "In the light of these authorities, and what is shown by this record, it is clear the officers here had justification for the search and seizure. This is to say that the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that intoxicating liquor was being transported in the automobile which they stopped and searched."

In the case of Cohn v. United States (1926) 57 App. D. C. 49, 16 F.(2d) 652, the same question was considered, and the court in referring to the testimony, said:

"A policeman on direct examination testified that he saw defendant driving an automobile past a certain street intersection in the city in the daytime, without giving the proper traffic signal, and noticed two boxes on the seat of the car partly covered. He knew the driver, the defendant, followed him some distance, then stopped him, and asked him what he had, to which defendant replied, 'Three boxes of corn.' At that time the officer had no warrant for the arrest of defendant, nor a search warrant for the car. He then took defendant to the station house 'and charged him with illegal possession, transporting, and violation of the traffic regulations.' When he stopped defendant, the officer observed a brown leather storm coat over the top of the boxes which were on the rear seat. The coat did not completely cover them. On top of the coat was a straw wrapper, and inside of that was a bottle containing some kind of liquor marked 'White Horse Scotch.' He identified a jar shown him by the assistant district attorney as one that was taken out of one of the boxes in defendant's car. At the station house 18 gallons of liquor were found in the car and seized. That it was intoxicating is conceded.

"On cross examination the officer said that he did not smell liquor when the car passed him, did not see or taste any, and did not know what was in the defendant's car, but that he had 'a good, strong suspicion.'

"On redirect examination he said that he knew the defendant, and knew that he had been, 'mixed up with liquor transac-

tions previous to this,' with which, as an officer, he had had nothing to do. He knew that whisky, gin, and other things like that were transported in the kind of cartons that were in defendant's car, had had, some experience as an officer in other liquor law violations, and his suspicions were aroused by seeing the cartons covered.

"On recross-examination the officer was again asked what the defendant said when asked what he had, and again he testified that the answer was: 'I have got three boxes of corn.' The witness was then asked if he remembered testifying in the case about a year ago, and if then he did not say that the defendant, answering the question as to what he had, said, ' "Oh, you know what I have," and started laughing.' Witness replied that he might have so testified; that his recollection was vague about the testimony which he gave at the former trial. He also said that he could see enough of the packages in defendant's car to discern that they were boxes similar to corn whisky boxes.

"The defendant testified in substance that he was requested by a friend to deliver and transport these cartons, but was ignorant of their contents, and denied that he told the officer that he had 'three boxes of corn on.' It is not claimed that, if defendant did use the language, he meant corn whisky, and that the officer so understood."

The court held that these facts constituted probable cause, and that the liquor found in the car and seized was admissible in evidence.

The present case reveals a much stronger probable cause than did the Carroll Case or the Cohn Case. Here the officers had been informed that the place at the rear of 271 River street was an unloading place for alcohol. One month previous, one of the officers saw Louis Hornfeld there and a truck containing baskets of empty quart bottles, and warned Hornfeld and others that they should stop unloading and transferring alcohol there. The officer visited the place about twice each week thereafter and looked the place over.

On the 18th day of July, the officers, when they saw the trucks backed end to end in the rear of the building, believed that alcohol was being unloaded or transferred. It is clear that they had reasonable grounds for their belief. They went to the open space in the rear of the building and noticed in one of the trucks pasteboard containers or cartons, which they recognized from prior experiences as prohibition officers as containers commonly used to cover cans of alcohol when being transported. They saw Rogato moving one of the pasteboard containers from one of the trucks, in which he was, to Hornfeld, who was in the other truck. Both Rogato and Hornfeld said they did not know what was in the containers.

Again I quote the language of Mr. Chief Justice Taft:

"In the light of these authorities, and what is shown by this record, it is clear the officers here had justification for the search and seizure. This is to say that the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that intoxicating liquor was being transported in the automobile which they stopped and searched."

It is contended that the evidence of what the officers saw and heard on December 18th at the rear of the building, 271 River street, Plains, Pa., should be suppressed, for the reason that the entry of the officers on the premises was unlawful; the officers at the time being trespassers and without a search warrant. It is true that the officers did enter upon the premises, 271 River street, without a search warrant. The officers testified that they could see the front ends of the trucks before entering the premises.

The attorney for the defendant argues that because of the situation of the building and the location of the trucks at the time, it was impossible for the officers to see the trucks without first going upon the premises. Louis Hornfeld stated in his affidavit dated February 11, 1930, which affidavit by agreement was submitted to the court with the testimony, "that there was backed up to this truck a Dodge three quarter ton truck with a carrying body of seven feet, but that these trucks were backed end to end in the rear of the premises above set forth, and only the radiators and hoods could be seen from the roadway, as the trucks were immediately behind the premises above described."

Even if the officers had not seen the trucks before going upon the premises, it was not necessary that they should have, nor did they need to serve, a search warrant before going upon the premises.

In Hester v. United States, 265 U. S. 57, page 58, 44 S. Ct. 445, 446, 68 L. Ed. 898, Mr. Justice Holmes, in delivering the opinion of the court, said:

"The witnesses whose testimony is objected to were revenue officers. In consequence of information they went toward the house

of Hester's father, where the plaintiff in error lived, and as they approached saw one Henderson drive near to the house. They concealed themselves from fifty to one hundred yards away and saw Hester come out and hand Henderson a quart bottle. An alarm was given. Hester went to a car standing near, took a gallon jug from it and he and Henderson ran. One of the officers pursued, and fired a pistol. Hester dropped his jug, which broke but kept about a quart of its contents. Henderson threw away his bottle also. The jug and bottle both contained what the officers, being experts, recognized as moonshine whisky, that is, whisky illicitly distilled; said to be easily recognizable. The other officer entered the house, but being told there was no whisky there left it, but found outside a jar that had been thrown out and broken and that also contained whisky. While the officers were there other cars stopped at the house but were spoken to by Hester's father and drove off. The officers had no warrant for search or arrest, and it is contended that this made their evidence inadmissible, it being assumed, on the strength of the pursuing officer's saying that he supposed they were on Hester's land, that such was the fact. It is obvious that even if there had been a trespass, the above testimony was not obtained by an illegal search or seizure. The defendant's own acts, and those of his associates, disclosed the jug, the jar and the bottle—and there was no seizure in the sense of the law when the officers examined the contents of each after it had been abandoned. This evidence was not obtained by the entry into the house and it is immaterial to discuss that. The suggestion that the defendant was compelled to give evidence against himself does not require an answer. The only shadow of a ground for bringing up the case is drawn from the hypothesis that the examination of the vessels took place upon Hester's father's land. As to that, it is enough to say that, apart from the justification, the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 Bl. Comm. 223, 225, 226."

Nor does the special protection accorded by the Fourth Amendment extend to the open driveways on each side of the building, or the open space in the rear of the building.

In Raine v. United States, 299 F. 407, page 410 (C. C. A. 9th), the court in the opinion said:

"It is true that the officers went upon the premises at night and in a secret manner, and awaited the appearance of the plaintiff in error; they having caused to be sent him what purported to be a friendly warning to the effect that officers would be there in the morning, and the advice that he 'dump that stuff in the willows.' The appearance of the plaintiff in error and his codefendant, Brite, upon the scene, was evidence to the officers that they had come in response to the warning, and that the illicit still in the dugout belonged to them. The officers heard Brite tell the plaintiff in error to stay and watch the place and 'kill the first son of a bitch that shows up.' They heard one of them remark 'that it smelled pretty strong down there,' referring to the dugout, and heard the other answer that he would go down and open it and let the air out. The officers had noticed the strong odor of fermentation, and after the dugout had been opened by Brite they saw the contents of it. When they told the plaintiff in error he was under arrest, he began firing and thereupon several shots were exchanged, and one of the officers was mortally wounded.

"The foregoing is the substance of the testimony as to what occurred on December 19. There was clearly no error in its admission. The officers were armed with a search warrant, but there was no occasion to use it. They did not need to serve it in order to go upon the land of the plaintiff in error. They had no occasion to open the door of the dugout. It was opened by Brite. They had ample evidence of their senses that a crime was then and there being committed. Conclusive against the contention here urged is Hester v. United States, 265 U. S. 57, 44 S. Ct. 445, 68 L. Ed. 898, decided by the Supreme Court on May 5, 1924. In that case the officers had no warrant for search or arrest. The evidence which they offered consisted of articles which they found in the dooryard of the premises of the accused."

In the Raine Case, the officers went upon the premises at night and in a secret manner before they saw the plaintiff in error and his codefendant. In the present case, the officers went upon the premises in the daytime and in an open manner, after they had seen the trucks, backed end to end in the open space in the rear of the building, which, under the circumstances, gave them reasonable cause to believe that intoxicating liquors were being unloaded or transferred there. In the present case, the officers did not need to serve a search warrant to go on the land where the driveways and open space were located, and it of course follows that they did not need to be armed with a search warrant.

In Koth v. United States, 16 F.(2d) 59, 61 (C. C. A. 9th), the court in the opinion said:

"The search was not unreasonable. It was upon open premises. 'The special protection accorded by the Fourth Amendment to the people in their "persons, houses, papers, and effects," is not extended to the open fields. The distinction between the latter and the house is as old as the common law.' Hester v. United States, 265 U. S. 57, 44 S. Ct. 445, 68 L. Ed. 898; Raine v. United States, supra. The officers were more than a quarter of a mile from the premises, smelled fermenting mash and fumes of distilling them in progress, and saw a drunken man approach from the direction of the still. Vaught v. United States (C. C. A.) 7 F.(2d) 370; United States v. Borkowski (D. C.) 268 F. 408; United States v. McBride (D. C.) 287 F. 214. The fact that the officers may have been trespassers does not exclude the evidence, after what they saw, heard and smelled. Raine v. United States, supra; Vaught v. United States, supra; Hester v. United States, supra; United States v. McBride, supra; Schulte v. United States (C. C. A.) 11 F. (2d) 105."

The suppression of the evidence must depend upon the legality of the search, seizure, and arrest. If the search and seizure were unlawful, the rule to suppress the evidence should be made absolute, and the evidence should be suppressed. However, if the search was legal and the liquor properly seized, the evidence should be admitted.

I am of opinion that the search was legal, and that the alcohol and trucks were properly seized. It follows that the rule to suppress the evidence ought to be discharged.

Now, March 7, 1930, the rule to show cause why the evidence should not be suppressed is discharged, and the petition is dismissed.