[Crim. No. 8976.   Second Dist., Div. One.   Mar. 9, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD
SHIELDS, Defendant and Appellant.

Robert M. Lawlis, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Gilbert F. Nelson and Robert A. Feldman, Deputy Attorneys General, for Plaintiff and Respondent.

LILLIE, J.—Defendant was convicted by a jury of four counts of grand theft; he admitted a prior felony conviction of burglary. Appealing from the judgment, he does not challenge the sufficiency of the evidence to support the conviction but contends that certain evidence was the product of an unlawful search of his backyard and garage, and that the trial court erred in refusing to allow the public defender to be relieved of representing him at the trial.

In March 1962, defendant under the name of Richard O'Shea, bought a 1957 Chevrolet, License Number UAH 929, from Merle Carter, for which he was given the pink slip; the vehicle had no engine and the front and rear were damaged. On April 10, a 1957 Chevrolet was stolen from Delia Woodward; thereafter on April 30, defendant, using the name of Richard O'Shea, sold this vehicle to Grant Velie for

$1,370. The pink slip thereto and the license plate thereon were numbered UAH 929; however, this was not the license number of the Woodward vehicle.

In December 1961, R. E. O'Shea bought a 1957 Ford, License Number UNL 169, for $265 from Pratt and Gallagher. On January 23, 1962, a 1957 Ford, License Number MLE 979, was stolen from Janet Baker; later in January defendant, as Richard O'Shea, using both a bill of sale and a pink slip, transferred it to Gladys Sullivan, for $850. Janet Baker identified the vehicle as the one stolen from her; the license plates were missing.

On May 2, 1962, Richard Newsome, Special Agent, National Automobile Theft Bureau, examined the Woodward vehicle, 1957 Chevrolet, License Number UAH 929; he determined that the identification plate on the door post had been glued on, not affixed by an electric weld. He removed the tag and found indications that a prior tag had been spot-welded to the door post. He contacted the Sheriff's office. Through a bill of sale given to Velie by O'Shea, Deputy Elliott went to the address thereon, but none of the occupants had ever heard of Richard O'Shea. A check was then made through the Department of Motor Vehicles of all automobiles owned by O'Shea. Finally, he was located through a Mr. Owens who recalled the residence of the seller to him of a 1957 Pontiac. The deputies and Owens went to 5735 Candlewood; the premises were connected with defendant through fingerprints. A handwriting expert testified that various records of car transactions bearing the signature "Richard O'Shea" were all in the same handwriting.

Citing numerous general rules relative to unlawful searches, appellant contends that the deputies unlawfully entered his fenced yard and garage, and certain evidence found therein was the product of an unlawful search and seizure. In this connection the following occurred prior to his arrest. Upon arriving at 5735 Candlewood, the deputies knocked on the front door of the residence; no one answered. They walked around to the back door. They observed a fenced-in yard on the rear of the premises and, at a place where they could see over the fence, they saw several automobiles in a cut-up condition, partially dismantled, and some automobile frames. Deputy Elliott testified that it was illegal to have cut-up, dismantled vehicles without a license from the Department of Motor Vehicles; and that the rear of the residence appeared to constitute a wrecking yard which was illegal in a resi-

dential area. They then walked into the yard and examined the automobiles and observed that identification plates had been taken from two of the vehicles; license plates had also been removed. One of the vehicles was a county automobile; the officer had information that this vehicle had been sold at auction to Richard O'Shea. He also knew what had become of the identification plates removed from the county vehicle; the identification appeared on the stolen 1957 Chevrolet.

Also on the premises was a garage. While the door was locked, it was sufficiently ajar for the deputies to look inside. They saw numerous automobile accessories, including radios, tires and heaters, also a cut-up Cadillac. The officers then forced the door and entered the garage. They found inside two license plates, a Shriner emblem, and a can of brake fluid on which were defendant's fingerprints.

■ The wrecking yard in which the dismantled automobiles and automobile frames were found, while at the rear of the premises on which defendant's house was located, had no connection with defendant's residence insofar as his living accommodations were concerned. The garage was also detached, both physically and in purpose, from the defendant's house. The Fourth Amendment, United States Constitution, and article I, section 19, California Constitution, alike guarantee the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizures, . . ." Under federal authorities, the premises around a house are without the protection of the Fourth Amendment; thus the area at the rear of defendant's residence being utilized solely as a wrecking yard does not come under the protection of the constitutional prohibitions.

■ "When the Constitution [federal] says the people shall be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, it does not mean to say that the lands of a person shall not be searched, nor that the premises of a person shall not be searched, because we all know that there is a very great difference between one's house and one's lands or premises, and the word 'house' does not include lands or premises. . . . I take it there is nowhere any provision [Constitution] against an officer searching one's lands or premises without having a warrant authorizing him to do so." (*United States* v. *McBride* (D.C. S.D. Ala. 1922) 287 F. 214, 216.) In *Hester* v. *United States*, 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898], the evidence was found on

defendant's land near his house; as to whether it was the product of an illegal search and seizure, the court said: ". . . the special protection accorded by the 4th Amendment to the people in their 'persons, houses, papers, and effects' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." (P. 59.)

The California courts follow the rule of *Hester* v. *United States*, 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898]. In *People* v. *Jackson*, 198 Cal.App.2d 698 [18 Cal.Rptr. 214], narcotics were admissible as evidence even though they were the product of a search of the backyard of defendant's house, a chicken coop and his garage where he conducted a television and radio repair shop. Citing the *Hester* case, *supra*, the court said: ". . . In accordance with this rule it has been held that the special protection accorded by the Fourteenth Amendment does not extend to 'enclosed or unenclosed grounds or open fields' around a house (*Martin* v. *United States* (5th Cir. 1946) 155 F.2d 503, 505); or 'to the open driveways on each side of the building, or the open space in the rear of the building' (*United States* v. *Rogato* (D.C.M.D. Pa. 1930) 39 F.2d 171, 175). To the same effect are *Koth* v. *United States* (9th Cir. 1926) 16 F.2d 59, 61; *Care* v. *United States* (10th Cir. 1956) 231 F.2d 22, 25; *People* v. *Grundeis*, 413 Ill. 145 [108 N.E.2d 483, 486-487]; *Wolf* v. *State*, 110 Tex.Crim.Rep. 124 [9 S.W.2d 350, 351]. See also *People* v. *Robles*, 183 Cal. App.2d 212, 215 [6 Cal.Rptr. 748] (yard next door); *People* v. *Montes*, 146 Cal.App.2d 530, 533 [303 P.2d 1064] (driveway); *People* v. *Bly*, 191 Cal.App.2d 352, 357 [12 Cal.Rptr. 542] (trash can); *People* v. *Lawton*, 150 Cal.App.2d 431, 433-434 [309 P.2d 862] (back yard of adjacent house); *People* v. *Hurst*, 183 Cal.App.2d 379, 385-386 [6 Cal.Rptr. 483] (under the house). We therefore conclude that the claim of unlawful search is not well grounded." (P. 704.) The court followed *Hester* in *People* v. *Reed*, 210 Cal.App.2d 80 [26 Cal.Rptr. 428]. Therein, before defendant's arrest, the officers found a rope used in a robbery protruding from under a boardwalk on defendant's land leading to the front door of his house. In addition to holding that the rope was in plain sight and had been discovered without a search, the court said that the area around the house could be searched without a warrant, and stated: "It is urged by defendant that the rope was obtained by an unlawful search and seizure. . . . However, in the case of *Hester* v. *United States*, 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898], it was settled that the Fourth

Amendment to the United States Constitution does not protect an open field which the accused may own. . . .'' (P. 83.)

As to the garage that, too, was not under the protection of the constitutional prohibition. In *Earl* v. *United States* (9th Cir. 1925) 4 F.2d 532, a garage, the basement of a dwelling house occupied by other tenants, was searched. The court said at pages 532-533: ''. . . So far as it concerns this case, the garage was in the position of a detached building, occupied and used only for garage purposes. . . . A garage, such as that in question here, is not a 'house,' within the protection of the constitutional amendment. It is no more immune from search than would be a barn or other outbuilding.'' Similarly, in *United States* v. *Wilds* (D.C.E.D. Tenn. 1949) 87 F.Supp. 459, the court, relying upon *Hester* v. *United States*, 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898], said of a chicken house in the rear of defendants' premises: ''. . . The building did not have such proximity to the dwelling house, nor was it in such a state of care, nor was it devoted to such a use, as entitled it to be regarded as one of those outbuildings essential to the comfort and personal well being of a family. It was not, therefore, entitled to the protection of the Fourth Amendment. [Citations.]'' (P. 460.)

Defendant's garage, which contained automobile accessories, including radios, tires and heaters, and a cut-up Cadillac, together with other items pertaining to automobiles, was detached both in space and in use from the house in which defendant lived. The building obviously was being used solely for garage purposes and in conjunction with an automobile wrecking yard. It was not entitled to be regarded as an outbuilding essential to the comfort and personal well-being of a family; it had no private character for living purposes such as a house, and was not, therefore, entitled to constitutional protection.

Appellant's only other contention is that the trial court erred in refusing to allow the public defender to be relieved from representing him at the trial. The record shows that on November 15, when the case was called, the public defender asked to be relieved, stating that defendant believed that his office could not adequately handle the case because of ''a very serious personal and factual conflict'' between him and defendant. The court told the defendant he could employ counsel and would give him a continuance for that purpose. From further colloquy it developed that the conflict between defendant and the public defender arose out of defendant's insist-

ence that he defend him on the ground that he had been kidnaped and brought to California, that there was no record of a Governor's warrant to bring him here. The court told defendant that his counsel knew how his defense should be presented and that the law doesn't support his claim of kidnaping and it could not be used as his defense. Defendant then asked if he could call the United States Attorney; the judge said he might make such a call in jail but not in court. He then stated he saw no ground for relieving the public defender and felt he could not appoint an outside attorney under the circumstances and continued the trial to November 28. The case was tried on December 13; when called for trial defendant said he wanted to appear in pro. per. and the court to appoint the public defender "to work in court concurrently." ▆▆▆ The judge explained that he could not do this. Defendant then insisted that he appear in pro. per.; the court asked him if he understood how to pick a jury and if he knew about a challenge for cause. Defendant answered, "No," and the court said, "All right. The Public Defender will represent you. Apparently you don't know how to handle a case. . . ."

▆▆▆ ". . . [T]he trial court is duty bound to determine whether he [defendant] is making a competent, intelligent and complete waiver of his constitutionally guaranteed right to be represented by counsel. [Citations.] . . . This obligation has been described as a 'serious and weighty responsibility' [citations]; its discharge requires 'a consideration of the nature of the charge, the facts and circumstances of the case, and the education, experience, mental competence and conduct of the accused' [citations]; and the determination made involves an exercise of discretion which, in the absence of a showing of abuse, will not be disturbed on appeal. [Citations.] . . ." (*People* v. *Shroyer,* 203 Cal.App.2d 478, 482-483 [21 Cal.Rptr. 460].) ▆▆▆ It is apparent from defendant's general demeanor and his response to the court's questions that he could not make a competent, intelligent and complete waiver of his right to counsel, and that he was not competent to represent himself at the trial. We find no abuse of the court's discretion.

▆▆▆ As to the appointment of other counsel, there was no justification for relieving the public defender. Defendant had been given 30 days in which to obtain private counsel; he did not do so. ▆▆▆ His request that the court appoint the public defender to work with him in pro. per. was prop-

erly denied. (*People* v. *Mattson*, 51 Cal.2d 777, 795 [336 P.2d 937]; *People* v. *Aguirre*, 181 Cal.App.2d 577, 580 [5 Cal. Rptr. 477].) The only point of difference between defendant and the public defender was defendant's insistence that he prepare a defense which was not legally available to him. ". . . The defendant must accept the attorney selected for him by the court in the exercise of a sound legal discretion; is not entitled to an attorney of his own choosing [citations]; in the absence of compelling reason, may not require the court to appoint another attorney for him; and is not entitled to a routine change of attorneys until he obtains one who is willing to subject his professional judgment to the judgment of his client, or who, perchance, is of the same opinion as the defendant with respect to matters of trial advantage, ethics or law. If the court does not believe that an indigent defendant is entitled to a change of attorneys, he must proceed with the attorney assigned to him, or waive his right to counsel and represent himself. Even the alternative is subject to court supervision, and before permission to do so is granted the court is duty bound to determine whether the defendant is making an intelligent and competent waiver. *People* v. *Mattson, supra,* 51 Cal.2d 777, 794 [336 P.2d 937]; *People* v. *Chesser,* 29 Cal.2d 815, 821 [178 P.2d 761, 170 A.L.R. 246]; *Johnson* v. *Zerbst,* 304 U.S. 458, 465 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357]." (*People* v. *Jackson,* 186 Cal.App.2d 307, 315-316 [8 Cal.Rptr. 849].)

We have examined the remaining contentions and find them to be without merit.

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.