[Crim. No. 11343.   Second Dist., Div. One.   Mar. 7, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. WALTER MAURICE LEE, Defendant and Appellant.

Walter Maurice Lee, in pro. per., and Nancy McKissack, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Stanton Price, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendant was charged in nine counts:—armed robbery (count I), kidnaping while armed for the purpose of robbery (counts II, III); with Bernard Jackson, Shirley Jackson and Jo Ann McCleary, murder (count IV) and armed robbery (count V); with Bernard Jackson, grand theft auto (count VI), armed robbery (count VII), kidnaping for purposes of robbery (count VIII) and assault with a deadly weapon (count IX); and with a prior (1962) felony conviction (robbery), which he admitted. The trial proceeded to a jury. After presentation of substantially all of the People's evidence, defendant withdrew his plea of not guilty to counts I, IV and VII and in its place entered his plea of guilty to Count I (first degree robbery, Stringfield), count IV (murder, Guercio) and count VII (first degree robbery, Docherty). He was sentenced to the state prison for life on count IV and for the term prescribed by law on counts I and VII, the sentences to run concurrently; the remaining counts were dismissed. Defendant appeals from the judgment.

While the conviction rests upon defendant's pleas of guilty, a brief résumé of the evidence is hereinafter set up to establish the background for the change of plea.

COUNTS I, II AND III (STRINGFIELD AND WILSON).

Around 1:25 a.m. on December 14, 1964, Stringfield and Wilson, two clerks, were alone in Webb's Liquor Store; Stringfield was behind the counter. Defendant, who was in the store, picked up two magazines, a bottle of wine and another item, and placed them on the counter. Stringfield rang up the sale and asked defendant for the money; defendant pulled a gun (resembling Exhibit 1) ordering Wilson from the front door and warning Stringfield not to push any alarm button. Then defendant told Stringfield to empty the cash register drawers in a bag. After Stringfield did so, defendant said, "I want the rest of the money from the back," and forced the two men to walk 10 feet to the rear of the store. He told Stringfield to lie on the floor and Wilson to transfer the money from the unlocked safe to the bag, then ordered the two men into the restroom. After slamming the door, defendant left. Defendant was identified by Wilson and Stringfield as the man who robbed them.

COUNTS IV AND V (JACK GUERCIO).

Officers Foster, Lewis and Conner in civilian clothes, were driving in an unmarked police car north bound on Broadway

where they came upon Jo Ann McCleary, talking to a man in a vehicle, and Shirley Jackson. Shirley walked over to the officers who said they were looking for some fun; Shirley said, "We can have a party if you will follow me to my place, but it is going to cost you." They followed the girls, observing defendant and Bernard Jackson standing nearby apparently drunk. Shirley said she had a "trick pad" on the block, but it appeared to be a deserted house and when they entered defendant and Jackson followed. The officers told them it was a private party and asked them to leave but they refused to do so. The girls insisted on knowing how much money the officers had; after telling them that they had between $25 and $30 they identified themselves and arrested the two women. As they were walking out, defendant and Jackson, who no longer appeared to be intoxicated, attempted to interfere and take the girls from the officers; after some scuffling and argument all four were booked.

Jack Guercio, a sailor, was home on leave; he carried in his wallet an Armed Forces identification card, an Armed Forces Geneva Convention identification card and a driver's license. On January 16, 1965, around 5:30 p.m., he left his house for a wedding and a reception at Wilshire and 21st Street; he left the wedding shortly before 10 p.m. That evening there was a party at the home of Glen Coon on 16th Street. Shortly after 10 p.m. the guests heard what sounded like a shot; Thomas Revels looked out of the window and saw a body on the lawn next door; it was the body of Jack Guercio. He had been shot in the brain. The wedding invitation was in Guercio's right hand; the top two buttons from his suit coat were missing—one was on the grass near the body, the other near the body; half of his Armed Forces identification card was in front of 807 5th Avenue; his driver's license, torn into pieces, was also in the alley, as were his liberty card and pieces of other papers. Bernard Jackson lived at 814 5th Avenue, Shirley Jackson and Jo Ann McCleary lived at 812 5th Avenue. Later Jack Guercio died in the hospital.

After defendant's arrest and on February 5, he talked with one Galardi, a fellow prisoner and trusty in the county jail. Defendant told him that he killed Guercio but that it had been accidental and unintentional; he asked Gilardi to take a message to his girl friend Frances Lee; he also said that he was not going to "cop out" and that he didn't think the officers could prove what he had done, and admitted to Galardi that he had held up a liquor store on December 14, taken a thousand

dollars and had a nice Christmas. Another inmate, Vargas, was in the same cell block as defendant; the two were discussing the murder (Guercio) which defendant claimed the police were trying "to hang" on him; Vargas asked, "Well, did you do it," and defendant replied, "Yes, but it was accidental." Later defendant referred to Jackson as "my crime partner."

COUNTS VII, VIII AND IX (AUTO THEFT AND DOCHERTY).

During January 1965, Alfa Auto Rentals owned a Volkswagen, license No. MES 761; on January 17 it was not rented to defendant, Jackson or anyone else. On January 17 Docherty was a ticket taker at the Studio Drive-In. Around 9 p.m. Jackson and defendant drove up in a green Volkswagen (license No. MES 761); Jackson walked toward the box office displaying a gun, saying to Docherty, "Let's go, this is a holdup." Then defendant ordered Docherty, Towers, the assistant manager, and the cashier into the box office. Following them in, Jackson took $81 and warned the three not to move. Meanwhile, defendant made a U-turn in the Volkswagen, pointing it away from the theater; as Jackson started to leave, the police came. Jackson ran, still holding the revolver, toward the Volkswagen, then threw the money and the gun away. Moments after defendant and Jackson were arrested, the gun was found 10 feet from the Volkswagen. There is a good possibility that the gun could have fired the bullet found in Guercio's head.

The only issue raised by appellant is that he was denied "effective assistance of counsel" as guaranteed by the federal and state Constitutions. He claims that prior to and during the trial he was not and could not be represented adequately by appointed counsel who from the outset wanted him to plead guilty; that he repeatedly requested that other counsel be appointed; that his appointed counsel finally coerced him into pleading guilty, later admitting that he would not have advised him to do so had he been fully informed; and that in pleading guilty he sacrificed various "appellate issues with reversible potentiality," i.e., the admissibility of his confession to his two cell mates (counts IV, V), identification (counts I, II, III), and his lack of complicity in the theater robbery (counts VII, VIII, IX)—he was present in the automobile "but that is all."

On arraignment (March 10, 1965) John Loucks, private counsel, was appointed to represent defendant. Thereafter

Loucks moved under section 995, Penal Code; the motion was denied, and the trial was set for May 17, 1965. On April 20, defendant's motion for severance was granted, and on defendant's motion the court appointed another private counsel, John L. Kearney, as associate counsel. On still another motion the court appointed William W. Harper to examine the evidence (Code Civ. Proc., § 8271). It appears from extended colloquy among defendant, Mr. Loucks and the court that between March 10, 1965, and May 17, 1965, Mr. Loucks thoroughly discussed the case with his client and made careful preparation for trial. The following occurred on the day of trial (May 17) out of the presence of the jury, and appears in no less than 40 pages of the reporter's transcript.

When the cause was called defendant advised the court that he had been told by Mr. Loucks ''to cop a plea'' of guilty and throw himself on the mercy of the court, but that he would not do so because he is ''innocent''; and that by reason of this he had no confidence in Mr. Loucks and no longer wanted him for his counsel. The judge told defendant that this was but a recommendation and did not mean that if he refuses to take it, Mr. Loucks ''will not exert his very considerable talent and ability'' in his behalf. Defendant insisted that he wanted to obtain from the Bar Association another lawyer in whom he would have confidence. The court advised that he is entitled to counsel, also to the discharge of his counsel but that he is not entitled to make a selection of any particular counsel. Mr. Loucks then told the court that he had advised defendant that *if* he had any connection whatsoever with the murder and if he could get a life sentence, that he should take it (there were four life sentences in the case) and enter a plea of guilty to the murder, and that the rest of the counts would be dismissed because he had talked to the district attorney in that regard; but *if* he was not connected with the murder he should keep his not guilty pleas and go to trial. After questioning the deputy district attorney, Mr. Loucks and the defendant, the judge advised defendant that he was not entitled to have new counsel appointed, thus there was no alternative but to permit him to represent himself which he would not do because he did not think he was equipped to conduct his own defense in a trial involving such serious consequences. Defendant agreed that he could not represent himself. The judge then said that in his opinion defendant had very competent counsel and that he would see that he got a fair trial and the best kind of representation through Mr. Loucks and Mr. Kearney. Finally,

the court offered defendant a continuance to permit him to engage private counsel but it developed from further inquiry that neither defendant nor his family had the means. Thus after inquiring about defendant's background, education, knowledge of the law and ability to defend himself, discussing the seriousness of the offenses charged and the complex issues involved, and taking a recess to call defendant's grandmother on the telephone and being advised by her that she was "financially embarrassed" and unable to raise money, as was defendant's father, the trial judge, concluding that defendant would be unable either to obtain private counsel or to represent himself, denied his motion to relieve Mr. Loucks and proceeded with the trial.

The trial judge's encounter with defendant and his hostile attitude is a lesson in patience and consideration. He had four alternatives—grant a continuance to permit defendant to retain private counsel, appoint other counsel to represent defendant, relieve Mr. Loucks and permit defendant to represent himself, or deny defendant's motion to relieve Mr. Loucks and proceed with the trial.

The first alternative the judge thoroughly explored, even to the extent of calling the only person who might possibly be able to help defendant—his grandmother, who advised that neither she nor defendant's father could afford to hire counsel. While the judge offered to grant a continuance to permit defendant to retain a lawyer, neither defendant nor his relatives had the means, and there appeared to be no future possibility that defendant would be able to raise the money. The court is not required to grant a continuance under such circumstances. From early March to May 17, he had ample opportunity to arrange for another lawyer if he did not wish to have Mr. Loucks represent him, but defendant made no effort to do so. Certainly one who desires to retain counsel is required to act with some degree of promptness and diligence (*People* v. *Terry,* 224 Cal.App.2d 415, 419 [36 Cal. Rptr. 722]); he is not entitled to unlimited continuances for that purpose. (*People* v. *Thomas,* 58 Cal.2d 121, 131 [23 Cal.Rptr. 161, 373 P.2d 97]; *People* v. *Stewart,* 240 Cal.App. 2d 1, 6 [50 Cal.Rptr. 26].)

As to the second alternative, which appears to have been that urged by the defendant on the trial court, an accused is not entitled to court-appointed counsel of his own choice. (*People* v. *Chessman,* 52 Cal.2d 467, 491 [341 P.2d 679]; *People* v. *Terry,* 224 Cal.App.2d 415, 418 [36 Cal.Rptr. 722].)

Counsel appointed by the court to represent a defendant must be accepted by him in the absence of some "compelling reason to the contrary." (*People* v. *Ortiz,* 195 Cal.App.2d 112, 116 [15 Cal.Rptr. 398]; *People* v. *Terry,* 224 Cal.App.2d 415, 418 [36 Cal.Rptr. 722].) There is none here—defendant's only reason for asking Mr. Loucks' discharge was that the latter had told him that *if* he had any connection with the murder he should throw himself on the mercy of the court on a plea of guilty because he thought the rest of the counts would be dismissed, but *if* he had not, he should retain his not guilty pleas and go to trial. It is the duty of counsel to give his client what he believes to be proper advice; is this then sufficient justification for relieving him? That this advice was given in good faith is reflected in the transcript of the testimony taken at the preliminary hearing which, in addition to other incriminating evidence, contains the testimony of Frances Lee, who had been living with defendant, that he had admitted to her that he had participated in the killing of Jack Guercio for some money. Thus, defendant was bound to accept the attorney selected for him by the court in the exercise of its sound judicial discretion. ■ " '. . . [he] is not entitled to an attorney of his own choosing [citations]; in the absence of compelling reason, [he] may not require the court to appoint another attorney for him; and is not entitled to a routine change of attorneys until he obtains one who is willing to subject his professional judgment to the judgment of his client, or who, perchance, is of the same opinion as the defendant with respect to matters of trial advantage, ethics or law. If the court does not believe that an indigent defendant is entitled to a change of attorneys, he must proceed with the attorney assigned to him, or waive his right to counsel and represent himself. Even the alternative is subject to court supervision, and before permission to do so is granted the court is duty bound to determine whether the defendant is making an intelligent and competent waiver. *People* v. *Mattson, supra,* 51 Cal.2d 777, 794 [336 P.2d 937]; *People* v. *Chesser,* 29 Cal.2d 815, 821 [178 P.2d 761, 170 A.L.R. 246]; *Johnson* v. *Zerbst,* 304 U.S. 458, 465 [82 L.Ed. 1461, 58 S.Ct. 1019, 146 A.L.R. 357].' (*People* v. *Jackson,* 186 Cal.App.2d 307, 315-316 [8 Cal.Rptr. 849].)'' (*People* v. *Shields,* 232 Cal.App.2d 716, 723 [43 Cal.Rptr. 188].) There being no cause to relieve counsel, the ruling of the court was proper. (*People* v. *Fuller,* 236 Cal.App.2d 889, 894 [46 Cal.Rptr. 435]; *People* v. *Zucker,* 177 Cal.App.2d 172, 179-180 [2 Cal.Rptr. 112];

*People* v. *Garabito,* 244 Cal.App.2d 549, 554 [53 Cal.Rptr. 152].)

█ The third alternative, under the circumstances, would have constituted reversible error. The court's exhaustive inquiry *(In re Johnson,* 237 Cal.App.2d 463, 467-468 [47 Cal. Rptr. 17]) revealed that because of defendant's age, background, education, immaturity, conduct and lack of knowledge of the law and the seriousness of the charges, he was definitely not capable of defending himself properly. It was the duty of the trial judge to determine whether defendant, in asking to be relieved of counsel, is making a competent, intelligent and complete waiver of his constitutional right to be represented by counsel. The determination involves an exercise of discretion which, in the absence of a showing of abuse, will not be disturbed on appeal. *(People* v. *Shroyer,* 203 Cal.App.2d 478, 482-483 [21 Cal.Rptr. 460] ; *People* v. *Shields,* 232 Cal.App.2d 716, 722 [43 Cal.Rptr. 188].) Defendant has an eleventh grade education, was 22 years old, was inarticulate, hostile and belligerent, and knew nothing about the law or court procedure ; the issues in the case were numerous and complex, including the admissibility of evidence of other crimes and of statements made to fellow prisoners; and the charges were of a very serious nature. We fully agree with the trial court's determination that defendant could not make a competent, intelligent and complete waiver of his right to counsel and that he was not competent to represent himself.

The fourth alternative, the court's refusal to relieve Mr. Loucks, was the only proper ruling it could make under the circumstances. Defendant was competently represented during the trial and at all times Mr. Loucks acted in defendant's best interest; the trial judge's confidence in his ability was fully justified. He was active in cross-examining the People's witnesses, interposing well-made and timely objections and preparing a defense; he had subpoenaed various defense witnesses. Present also was associate counsel, John L. Kearney, Jr. █ Appellant's real objection, however, seems to be that Mr. Loucks "coerced" him into pleading guilty without properly informing himself of the facts, predicated on Mr. Loucks' statement to the court at the time of sentence that had he known the facts stated by defendant to the probation officer he would not have advised him to plead guilty.

After defendant's change of plea and on his application for probation, the matter was referred to the probation officer. To him defendant made a statement containing facts which, if

true, might constitute a defense to the charge of murder which he had not previously told Mr. Loucks. The probation report quoted this statement relative to the murder of Jack Guercio —"this situation did not begin as a robbery but it began as a fight, and that during the fight the gun was accidentally discharged and then apparently thereafter someone robbed the victim." Mr. Loucks then said to the court: "Now, I believe the report also indicates that the defendant told no one of these facts. As a matter of fact, the first time that I ever heard of these facts was when I read it in the probation report, and I am quite sure that if I had known these facts and known of the possible intoxication of the victim at the time that the murder occurred, I would have gone to trial with that theory of the case in mind and would have struggled with the jury for a second degree murder or even, perhaps, manslaughter. However, those facts were not revealed to counsel and the defendant has pleaded guilty, and the question now is before your Honor as to the punishment between life imprisonment and death. . . ."

At the outset, appellant proceeds on the assumption that the facts related by him to the probation officer are true; had they been true, there is no reasonable explanation for his failure to tell them to his counsel at the time he was preparing for trial. Moreover, it is apparent that Mr. Loucks used the statement at the time of sentence in a bit of strategy in an effort to save the defendant from the gas chamber. Defendant had the duty of informing his attorney of all facts within his knowledge; Mr. Loucks though a competent lawyer was not a mind reader. Defendant is hardly in a position now to seek a ruling that his counsel's lack of knowledge of these "facts" rendered him incompetent and his advice improper; he cannot play fast and loose with court and counsel. (*People* v. *Garabito,* 244 Cal.App.2d 549, 554 [53 Cal.Rptr. 152].) The *real* reason defendant changed his pleas to guilty was not that he was "coerced" into doing so by his counsel, as he now claims, but because of his discovery that morning that his codefendant in the murder charge, Bernard Jackson, would appear as a witness for the prosecution. As stated by the deputy district attorney to the court at the time of sentence, "the codefendant Bernard Jackson . . . was, as the Court knows, prepared to testify against Mr. Lee just prior to the entry of the guilty plea by Mr. Lee—the People have never contended that this was a deliberate killing by Mr. Lee. We have contended . . . that this was a killing which incidentally

occurred during the perpetration of a robbery and, therefore, falls quite clearly within the first degree murder category." Clearly the impetus for his change of pleas was the planned appearance of Jackson for the People; no one, least of all his counsel, "coerced" him into pleading guilty. He freely and voluntarily did so because he felt he was in fact guilty. He knew all of the evidence offered against him—he sat through the preliminary hearing and heard the witnesses testify, particularly Frances Lee; he sat through the trial and knew the People's case; moreover, he knew that the prosecution intended to reopen its case to offer against him the testimony of Bernard Jackson. Before changing his pleas, defendant was thoroughly questioned as to each count; three times he indicated he understood the proceedings and stated that he was changing his plea willingly and voluntarily with full understanding of the nature of what he was doing, that no promises had been made to him and that he was pleading guilty because he was in fact guilty of the charge.

■ His final claim that in allowing him to plead guilty his counsel prevented him from preserving on appeal "many appellate issues with reversible potentiality" deserves but little discussion. There could be no legitimate issue of the admissibility of the testimony of Galardi and Vargas, defendant's cell mates, for it was not barred by the rules laid down in *Massiah* v. *United States*, 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], *Escobedo* v. *Illinois*, 378 U.S. 478 [2 L.Ed.2d 977, 84 S.Ct. 1758], or *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361]. The record shows that while Vargas and Galardi were inmates, they were in no manner agents of the police or acting for law enforcement officers—they were not placed in jail to be in proximity to the defendant or for the purpose of eliciting his statement, they were in no way asked or encouraged to seek information from him, and until informed (after the conversations occurred) the police did not know that the defendant had any contact with them. The police were not involved, no officer was present and no police questioning of any kind took place. Whatever was said was entirely unsolicited by the police and defendant was not subjected to any kind of official inquiry or interrogation. (*People* v. *Ross*, 236 Cal.App.2d 364, 372 [46 Cal.Rptr. 41].) After *voir dire* examination, the trial judge determined that the testimony was admissible.[1] There is a complete absence of any

---

[1] "Well, the Court will make a determinative finding that any statements, if there are statements, made by the defendant to either Galardi

showing in the record that "the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements." (*People* v. *Dorado,* 62 Cal.2d 338, 353 [42 Cal.Rptr. 169, 398 P.2d 361].) Moreover, the immediate impetus for defendant's admissions to Galardi was his desire, voluntarily expressed, that Galardi communicate with Frances (*In re Schlette,* 232 Cal.App.2d 407, 412 [42 Cal.Rptr. 708]; *People* v. *Ross,* 236 Cal.App.2d 364, 373 [46 Cal.Rptr. 41]); and the admissions were the result of a rather casual conversation in which defendant indulged to elicit aid and sympathy of the two men.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 4, 1967.

---

or Vargas were made to them without their having been placed in the facility where the defendant or Jackson were for the purpose of obtaining any information from him nor were they delegated specifically or impliedly, directly or indirectly, to obtain such information from the defendant or from Jackson.''